# United States Court of Appeals
## For the First Circuit

No. 18-2100

JACELYS MIGUELINA DE PENA-PANIAGUA,

Petitioner,

v.

WILLIAM P. BARR, Attorney General,

Respondent.

PETITION FOR REVIEW OF AN ORDER OF
THE BOARD OF IMMIGRATION APPEALS

Before

Howard, Chief Judge,
Kayatta and Barron, Circuit Judges.

Jonathan Ng, with whom Robert F. Ley and Law Offices of Johanna Herrero were on brief, for petitioner.
Eunice Lee, with whom Blaine Bookey, Anne Dutton, and Karen Musalo were on brief, for Center for Gender and Refugee Studies, amicus curiae.
Sheila I. Velez Martinez, Linda Hamilton, Nahla Kamaluddin, and University of Pittsburgh School of Law Immigration Law Clinic, on brief for Catholic Legal Immigration Network, Inc., Hebrew Immigrant Aid Society, Leadership Conference of Women Religious, National Council of Jewish Women, and Unitarian Universalist Service Committee, amici curiae.
Anjum Gupta and Mary Holper, on brief for Immigration Law Professors, amicus curiae.
John Willshire Carrera, Zachary A. Albun, Nancy Kelly, Sabrineh Ardalan, Deborah Anker, Steven H. Schulman, Martine E. Cicconi, and Akin Gump Strauss Hauer & Feld LLP, on brief for Harvard Immigration and Refugee Clinical Program, amicus curiae.

Richard W. Mark, Amer S. Ahmed, Indraneel Sur, Timothy Sun, Grace E. Hart, Chris Jones, and Gibson, Dunn & Crutcher LLP, on brief for Twenty-Nine Former Immigration Judges and Members of the Board of Immigration Appeals, amicus curiae.

Christina P. Greer, Trial Attorney, Office of Immigration Litigation, U.S. Department of Justice, with whom Joseph H. Hunt, Assistant Attorney General, Civil Division, U.S. Department of Justice, and Terri J. Scadron, Assistant Director, Office of Immigration Litigation, were on brief, for respondent.

———————————

April 24, 2020

———————————

**KAYATTA**, **Circuit Judge**.  In this case we confront the perplexing question of whether the requirements for establishing membership in a particular social group in support of a request for asylum or withholding of removal categorically reject any group defined in material part as women "unable to leave" a domestic relationship.  For the following reasons, we hold that there is no such categorical rule precluding any and all applicants from successfully relying upon such a group in support of a request for asylum or withholding of removal.

## I.

### A.

Petitioner Jacelys Miguelina De Pena-Paniagua (De Pena), a native and citizen of the Dominican Republic, entered the United States without inspection in late 2013.  Conceding removability, she sought asylum, withholding of removal under 8 U.S.C. § 1231(b)(3), and protection under Article 3 of the United Nations Convention Against Torture (CAT).  De Pena alleges that Hanlet Rafael Arias Melo (Arias), her former domestic partner and the father of her son, abused her in the past, will abuse her in the future, and will remain undeterred by Dominican law enforcement authorities, who have been nonresponsive to her requests for help.

According to De Pena, her mistreatment by Arias began with "verbal abuse and controlling behavior."  Once she became pregnant, the abuse worsened in form and degree.  In her

- 3 -

declaration, De Pena stated that Arias raped her five times during her pregnancy in 2006.

After one incident in which Arias "threw [her] against the wall," De Pena became afraid that she would miscarry and moved back to her parents' house. She testified that she and Arias stopped living together in November 2006 and finally broke off their relationship sometime after their son, Ronny, was born on December 4, 2006.

Arias made no effort to force De Pena to take up residence with him again. Instead, almost immediately following Ronny's birth, Arias turned his efforts towards securing control of the child. On December 12, 2006, Arias came to De Pena's parents' home and threatened to kill De Pena if she refused to turn over their son. He pulled her hair and tried to strangle her. De Pena fell down with the baby in her arms, and her C-section scar opened. De Pena's neighbors took her to the hospital. On December 14, 2006, she reported this attack to the national police and a local domestic violence unit. The police report labeled her complaint as an "attempted homicide" and "death threat," noting that De Pena complained that Arias "abuse[d her] psychologically and verbally and want[ed] to take [their] son away by use of force," threatened to kill her if she did not turn Ronny over, and tried to "force [her] to sign . . . false judicial documents" pertaining to Ronny's custody. Arias was never arrested, and

- 4 -

De Pena testified that the police "didn't do anything" to protect her.

From 2007 to 2013, De Pena continued to live with Ronny at her parents' house, apart from Arias. According to her, Arias continued to turn up frequently at the parents' house to harass and threaten her, demanding that she hand over Ronny. Arias also refused to financially support Ronny's medical care. There was a period of relative calm when Arias seemed to be "over the anger," but, De Pena claimed, "he became really furious" when she started seeing another man. On January 10, 2013, Arias came to her parents' house and again demanded that she give Ronny to him. He threw a telephone at her head, pulled her hair, hit her, and started to strangle her. De Pena testified that he "tried to kill [her]." Ronny ran out of the room screaming, and the neighbors separated Arias and De Pena and brought De Pena to the hospital. Medical records from the hospital visit indicated that she had "bruised trauma of the face, chest, and right arm." De Pena reported this attack to the local police, who labeled the incident, "Death Threat & Attempted Homicide." Arias was not arrested.

In April 2013, De Pena left the Dominican Republic for Panama, leaving Ronny behind with her parents. Shortly after arriving in Panama, De Pena realized she was pregnant with her second child. In September of that year, Arias called De Pena's

mother and told her that he had figured out where De Pena was living in Panama.

So, De Pena testified, she fled to the United States. She entered Laredo, Texas, on or around December 18, 2013, where she was apprehended by Customs and Border Patrol. Her daughter was born the next day.

De Pena retained the services of counsel who secured her release from Department of Homeland Security custody. She received a Notice to Appear for removal proceedings on December 19, 2013, and admitted to the allegations against her, conceding removability. On March 20, 2014, she submitted an I-589 Application, complying with the applicable one-year filing deadline. On December 15, 2015, she filed a revised I-589 Application, which was accepted as timely. The immigration court in Boston heard the merits of her I-589 application for asylum, withholding or removal, and CAT protection on September 11, 2017.

**B.**

De Pena's merits hearing did not go well for her. The immigration judge (IJ) found her testimony inconsistent in several respects. De Pena initially denied having a Facebook page but then admitted that she does maintain a public Facebook profile on which she posts pictures of both her children. The IJ also underlined the apparent discrepancy between De Pena's testimony about her son and her later behavior. Recall that in regard to

- 6 -

both the 2006 and 2013 assaults that she reported to the police, De Pena testified that Arias's threats and violence were aimed at obtaining custody of Ronny, rather than securing her return to Arias's house. Yet, when De Pena fled the country, she left her son behind with her parents in the same neighborhood as Arias. No evidence was submitted that Arias attempted to assert control over the child in De Pena's absence either. The IJ further noted that the police reports De Pena submitted in support of her application did not indicate, as she testified on direct, that Arias attempted to strangle her.

These discrepancies do not bear directly on the question of whether Arias severely abused De Pena. Nor did the IJ find De Pena not credible generally. But the cited discrepancies do seem to have contributed to the IJ's doubts about her reliability, especially as it applies to her claim of a fear of future persecution. See Pan v. Gonzales, 489 F.3d 80, 86 (1st Cir. 2007) ("Some of these inconsistencies, in isolation, may seem like small potatoes. What counts, however, is that their cumulative effect is great."); see also Legal v. Lynch, 838 F.3d 51, 54 (1st Cir. 2016) ("[A] factfinder may base a credibility determination on inconsistencies . . . 'without regard to whether [any such inconsistency] goes to the heart of the applicant's claim.'" (quoting 8 U.S.C. § 1158(b)(1)(B)(iii))).

- 7 -

The IJ ruled against De Pena for several reasons. First, after noting that "[p]ersecution is an extreme concept requiring more than a few isolated incidents of verbal harassment or intimidation," the IJ stated that De Pena "has only testified to two isolated incidents" of abuse, describing the incidents as "being pushed up against a wall and . . . having been supposedly choked." In so stating, the IJ made no mention of De Pena's claim to have been repeatedly raped prior to 2006. The IJ also did not mention De Pena's allegation that Arias repeatedly harassed and threatened her and her parents after she stopped living with him. Second, the IJ declared that there is no "credible evidence presented that the [Dominican] government is unable or unwilling to intervene or protect [De Pena]," stating that "the police have indicated that they would investigate the incidents . . . and the police further took police reports." Third, because she left her son in the Dominican Republic where Arias can reach him and keeps a Facebook page that would allow Arias to find her, the IJ found that she lacked either subjective or objective fear of persecution. Fourth, the IJ found that "the particular social group that is claimed by [De Pena] does not meet the requirements under the law." The IJ did not address whether De Pena, who had moved out of her home with Arias in 2006, actually belonged to any of the groups in which she claimed membership, and the government did not contend that she did not.

De Pena appealed to the Board of Immigration Appeals (BIA). The BIA found "no legal error or clear factual error in the Immigration Judge's determination that [De Pena] has not established past persecution or a well-founded fear of persecution on account of one of the five enumerated grounds under the Act," citing generally to the IJ's explanation of the grounds for his decision. It added, however, that "[e]ven if [De Pena] had suffered harm rising to the level of past persecution," De Pena's proposed particular social groups are analogous to those in Matter of A-R-C-G, 26 I. & N. Dec. 388 (BIA 2014), which the BIA understood to have been "overruled" by the Attorney General in Matter of A-B, 27 I. & N. Dec. 316, 319 (A.G. 2018). The BIA read A-B as "determin[ing] that the particular social group of 'married women in Guatemala who are unable to leave their relationship' did not meet the legal standards to qualify as a valid particular social group."

At first blush, the BIA opinion does not make clear whether the Board adopted all of the reasons given by the IJ for refusing relief, or whether it found it sufficient to rest its ruling only on the claimed inadequacy of the tendered social groups.[1]  A footnote added at the end of the ruling provides

---

[1] The BIA did, however, clearly determine that De Pena had waived her CAT claim. De Pena does not meaningfully challenge this decision on appeal before this court. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in

- 9 -

guidance.  It states in relevant part:  "In light of our decision, we find it unnecessary to address any of the remaining issues raised by [De Pena] on appeal."  Given this guidance, we are unable to presume that the BIA made any rulings beyond the social group ruling which, if correct, would indeed render the additional issues of no moment.[2]  Reading the decision so finds further support in the BIA's reliance on A-B, which prominently states:  "[I]f an alien's asylum application is fatally flawed in one respect, . . . the Board need not examine the remaining elements of the asylum claim."  27 I. & N. Dec. at 340.  We therefore train our analysis on the social group ruling.

## II.

To prevail on a claim for asylum, or withholding of removal, a petitioner need prove that she is unable or unwilling to return or to avail herself of the protection of her own country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion."  8 U.S.C. § 1101(a)(42)(A). De Pena claims persecution on account of her membership in a particular social group, prompting the contest in this case over

---

a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

[2] We thus do not address whether there is merit to the arguments that De Pena raises about problems with the IJ's rulings on those grounds.

whether the several groups in which she claims membership qualify as "a particular social group."  Those groups, as defined by her before the BIA and on appeal, all share the common definitional element of including Dominican women unable to leave (or "escape") a relationship with the man who abuses them.  The groups are as follows:  "Dominican women abused and viewed as property by their romantic partners, who are unable to escape or seek protection, by virtue of their gender"; "Dominican women viewed as property and unable to leave a domestic relationship"; and "Dominican women unable to leave a domestic relationship."

To affirm the IJ's conclusion that De Pena's proposed social groups "do[] not meet the requirements under the law," the BIA relied exclusively on the Attorney General's decision in A-B, 27 I. & N. Dec. at 319.  The BIA construed that opinion as "determin[ing] that the particular social group of 'married women in Guatemala who are unable to leave their relationship' did not meet the legal standards to qualify as a valued particular social group."  Based on that reading of A-B, the BIA concluded that De Pena "has not presented a cognizable particular social group."

That conclusion poses two questions to be resolved on this appeal:  First, does A-B categorically reject any social group defined in material part by its members' "inability to leave" the relationships in which they are being persecuted; and, second, if so, is A-B to that extent consistent with the law?

- 11 -

As to the first question, A-B points to three reasons for rejecting groups defined in part by their members' inability leave a relationship: (1) "Social groups defined by their vulnerability to private criminal activity likely lack the particularity required . . . ." Id. at 335; (2) "[T]here is significant room for doubt that Guatemalan society views these women . . . as members of a distinct group in society . . . ." Id. at 336; and (3) Because the "inability 'to leave'" is "created by harm or threatened harm," the group definition becomes improperly circular as it "moots the need to establish actual persecution," id. at 335, notwithstanding the statutory requirement that an asylum applicant show that she has suffered persecution "on account of" her membership in a particular social group, 8 U.S.C. § 1101(a)(42)(A). "[A] particular social group must 'exist independently' of the harm asserted in an application for asylum or statutory withholding of removal." Id. at 334 (emphasis in original) (quoting Matter of M-E-V-G, 26 I. & N. Dec. 227, 236 n.11 (BIA 2014)).

A-B quite clearly does not hold out the first two stated reasons as categorically and necessarily applicable to render inadequate in every case a group defined in part by its members' inability to leave the relationship that results in their abuse. Indeed, as to particularity, A-B holds only that such a group "likely" lacks the required particularity. Id. at 335. And as to

- 12 -

social distinctiveness, A-B only voices "significant room for doubt that Guatemalan society views these women . . . as members of a distinct group." Id. at 336. Neither of these observations on its face claims to provide any justification for categorically rejecting such a group without further consideration of the particulars of a given case.

Less clear is the full reach and meaning of A-B's objection to "unable to leave" groups as improperly defined by the persecution of their members. Id. at 335. ("[I]f a group is defined by the persecution of its members, then the definition of the group moots the need to establish actual persecution"). This objection to the claimed circularity of the group definition can be read as categorial, as the opinion adopts a quote from Rreshpja v. Gonzales, stating that "[t]he individuals in the group must share a narrowing characteristic other than their risk of being persecuted." Id. (alteration in original) (quoting Rreshpja, 420 F.3d 551, 556 (6th Cir. 2005)). And the Attorney General also critiqued the BIA holding in A-R-C-G not because it failed to consider whether the "unable to leave" group suffered from such circularity, but rather because it "never considered that 'married women in Guatemala who are unable to leave their relationship'" was a group "defined to consist of women in Guatemala who are victims of domestic abuse," where their "inability 'to leave' was created by harm or threatened harm." Id. (emphasis added).

It is nevertheless not entirely clear that A-B should be read as categorical even on the matter of circularity. After all, A-B remanded the case for further consideration, rather than decreeing rejection of the application. But given the BIA's decision in this case to declare De Pena's proffered groups inadequate without any discussion of her particular circumstances or evidence of attitudes and views in the Dominican Republic, it seems clear that the BIA in this case must have viewed the circularity objection as categorical; i.e., that any group defined by its members' inability to leave a relationship must be insufficient. Indeed, we see no other way to reconcile the precise language in A-B with the holding in this case.

So that brings us to our second question. Is it reasonable to read the law as supporting such a categorical rejection of any group defined by its members' inability to leave relationships with their abusers? A-B itself cites only fiat to support its affirmative answer to this question. It presumes that the inability to leave is always caused by the persecution from which the noncitizen seeks haven, and it presumes that no type of persecution can do double duty, both helping to define the particular social group and providing the harm blocking the pathway to that haven. These presumptions strike us as arbitrary on at least two grounds.

First, a woman's inability to leave a relationship may be the product of forces other than physical abuse. In Perez-Rabanales v. Sessions, we distinguished a putative group of women defined by their attempt "to escape systemic and severe violence" from a group defined as "married women in Guatemala who are unable to leave their relationship," describing only the former as defined by the persecution of its members. 881 F.3d 61, 67 (1st Cir. 2018). In fact, the combination of several cultural, societal, religious, economic, or other factors may in some cases explain why a woman is unable to leave a relationship. See A-R-C-G, 26 I. & N. Dec. at 393 (explaining that "a married woman's inability to leave the relationship may be informed by societal expectations about gender and subordination, as well as legal constraints regarding divorce and separation"); see also Paiz-Morales v. Lynch, 795 F.3d 238, 245 (1st Cir. 2015) ("Social group determinations are made on a case-by-case basis." (quoting M-E-V-G, 26 I. & N. Dec. at 251)); Gizelle Lugo, The Dominican Republic's Epidemic of Domestic Violence, Guardian (Nov. 23, 2012) ("[E]conomic disparity puts women in a vulnerable position because it renders them powerless and, in an abusive situation, complicates the process of leaving."). We therefore do not see any basis other than arbitrary and unexamined fiat for categorically decreeing without examination that there are no women in Guatemala who reasonably feel unable to leave domestic relationships as a result

of forces other than physical abuse. In such cases, physical abuse might be visited upon women because they are among those unable to leave, even though such abuse does not define membership in the group of women who are unable to leave.

Second, threatened physical abuse that precludes departure from a domestic relationship may not always be the same in type or quality as the physical abuse visited upon a woman within the relationship. More importantly, we see no logic or reason behind the assertion that abuse cannot do double duty, both helping to define the group, and providing the basis for a finding of persecution. An unfreed slave in first century Rome might well have been persecuted precisely because he had been enslaved (making him all the same unable to leave his master). Yet we see no reason why such a person could not seek asylum merely because the threat of abuse maintained his enslaved status. As DHS itself once observed, the "sustained physical abuse of [a] slave undoubtedly could constitute persecution independently of the condition of slavery." Brief of DHS at 34 n.10, Matter of R-A, 23 I. & N. Dec. 694 (A.G. 2005).

For these reasons, we reject as arbitrary and unexamined the BIA holding in this case that De Pena's claim necessarily fails because the groups to which she claims to belong are necessarily deficient. Rather, the BIA need consider, at least, whether the

- 16 -

proffered groups exist and in fact satisfy the requirements for constituting a particular social group to which De Pena belongs.

The foregoing does leave one possible loose end. While De Pena did not claim membership in a group defined by gender alone before the IJ or the Board, relying instead on A-R-C-G, 26 I. & N. at 388, she did cite to Matter of Acosta, 19 I. & N. Dec. 211 (BIA 1985), overruled in part on other grounds by Matter of Mogharrabi, 19 I. & N. Dec. 439, 441 (BIA 1987), to note that the "Board specifically recognized 'sex' as an example of an innate or immutable characteristic that can define a [particular social group]," and that a "[particular social group] defined based on gender per se is necessary." She also stated that "[a] social group defined by gender satisfies the particularity requirement because gender is not a vague, indeterminate, or subjective characteristic." On appeal, she again argues that her "proposed social groups satisfy the immutability requirement because they are defined by gender and nationality, two innate characteristics that are fundamental to an individual's identity." She further maintains that a group based on gender, namely "Dominican women," satisfies the particularity requirement.

One might therefore ask, why bother with "unable to leave" in the group definition. "Women," or "women in a certain country," are groups that are much more clearly defined, thus eliminating the problems presented by groups defined as "women who

- 17 -

are unable to leave." Precedent, though, encouraged the attempt at group definitions such as relied on here by De Pena. Some case law gave rise to a fear that "women," or "women in country X," or even "women in a domestic relationship," might be too large or too indistinct a group to serve as a particular social group. See, e.g., Da Silva v. Att'y Gen., 459 F. App'x 838, 841 (11th Cir. 2012); Rreshpja, 420 F.3d at 556; Safaie v. INS, 25 F.3d 636, 640 (8th Cir. 1994). But see Hassan v. Gonzales, 484 F.3d 513, 518 (8th Cir. 2007). At the same time, precedent -- most notably the BIA's own decision in A-R-C-G, 26 I. & N. Dec. at 393 -- held out "unable to leave" as a supposedly smaller, better-suited safe harbor for women seeking asylum and withholding of removal.

The Attorney General has now seen fit to announce the closure -- or at least the minimizing -- of that safe harbor. A-B, 27 I. & N. Dec. at 333-40. And in De Pena's case, that announcement came after her hearing before the IJ closed. Whether that timing entitles her to claim now on remand to belong to a group defined merely as Dominican women, or Dominican women in domestic relationship, we leave in the first instance to the BIA.

But grasping for the larger group hardly strikes us as a fool's errand. In 1985, the BIA recognized that a particular social group is indeed a group of "persons all of whom share a common, immutable characteristic," including "sex." Acosta, 19 I. & N. Dec. at 233; see also M-E-V-G, 26 I. & N. Dec. at 246 (observing

- 18 -

that "[s]ocial groups based on innate characteristics such as sex .
. . are generally easily recognizable and understood by others to
constitute social groups" (quoting Matter of C-A, 23 I. & N. Dec.
951, 959 (BIA 2006))).  This circuit has adopted this formulation,
recognizing sex as an immutable characteristic.  See, e.g.,
Mayorga-Vidal v. Holder, 675 F.3d 9, 14 (1st Cir. 2012); Scatambuli
v. Holder, 558 F.3d 53, 58 n.2 (1st Cir. 2009).

Two additional requirements have been added over the
years and deployed in ways that may have cast some doubt on the
possibility of a group defined as "women," as sensible as it would
seem to be.  In a pair of cases in 2008, the BIA decided that
"particularity" and "social visibility" were further requirements
for a particular social group, in addition to Acosta's "immutable
characteristics" test.  See Matter of S-E-G, 24 I. & N. Dec. 579,
582 (BIA 2008) (explaining that a social group must have
"particular and well-defined boundaries, and . . . possess a
recognized level of social visibility"); Matter of E-A-G, 24
I. & N. Dec. 591, 594 (BIA 2008) (explaining that a group must
exhibit "social visibility that would allow others to identify
[the group's] members as part of such a group").  The "social
visibility" requirement has further evolved into a requirement of
"social distinction," meaning, "an external perception . . . within
a given society."  M-E-V-G, 26 I. & N. Dec. at 236.

- 19 -

As the test currently stands in this circuit, then, "an applicant seeking asylum or withholding of removal 'based on "membership in a particular social group" must establish that the group is: (1) composed of members who share a common immutable characteristic, (2) defined with particularity, and (3) socially distinct within the society in question.'" Paiz-Morales, 795 F.3d at 244 (quoting M-E-V-G, 26 I. & N. Dec. at 237). Applying the "particularity" and "social distinctiveness" requirements, we have previously found proposed groups relying on categories similar to "unable to leave" impermissible, based on the records in those cases. See Aguilar-De Guillen v. Sessions, 902 F.3d 28, 35 (1st Cir. 2018) (rejecting a claimed particular social group of "single mothers who are living without male protection and cannot relocate elsewhere in the country"); Perez-Rabanales, 881 F.3d at 66 (rejecting petitioner's claimed particular social group of "Guatemalan women who try to escape systemic and sever violence who are unable to receive official protection"); Mendez-Barrera v. Holder, 602 F.3d 21, 27 (1st Cir. 2010) (affirming the BIA's rejection of a claimed particular social group of "young women recruited by gang members who resist such recruitment").

But it is not clear why a larger group defined as "women," or "women in country X" -- without reference to additional limiting terms -- fails either the "particularity" or "social distinction" requirement. Certainly, it is difficult to

think of a country in which women are not viewed as "distinct" from other members of society.  In some countries, gender serves as a principal, basic differentiation for assigning social and political status and rights, with women sometimes being compelled to attire and conduct themselves in a manner that signifies and highlights their membership in their group.  It is equally difficult to think of a country in which women do not form a "particular" and "well-defined" group of persons.  While certain more narrowly-parsed groups might fail to exhibit societal salience, or internally coherent membership, the same does not follow for a group based on a gender.

In Acosta, the Board applied the doctrine of ejusdem generis when interpreting the meaning of the term "refugee," which, pursuant to statute, requires that an applicant demonstrate "a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A).  This doctrine, as explained by the Board, "holds that general words used in an enumeration with specific words should be construed in a manner consistent with the specific words." Acosta, 19 I. & N. Dec. at 233. Reading the statute in this light, the Board reasoned that each term -- "race, religion, nationality, membership in a particular social group, or political opinion" -- "describes persecution aimed at an immutable characteristic."  Id.  "The shared

- 21 -

characteristic" underlying a particular social group, therefore, "might be an innate one such as sex, color, or kinship ties," which would make the fact of membership "something comparable to the other four grounds of persecution under the Act." Id. It is unsurprising, then, that if race, religion, and nationality typically refer to large classes of persons, particular social groups -- which are equally based on innate characteristics -- may sometimes do so as well. See Perdomo v. Holder, 611 F.3d 662, 669 (9th Cir. 2010) (explaining in the context of a claimed gender-based particular social group that the "size and breadth of a group alone does not preclude a group from qualifying as . . . a social group"); see also N.L.A. v. Holder, 744 F.3d 425, 438 (7th Cir. 2014) (noting that the court "does not determine the legitimacy of social groups by the narrowness of the category"); Cece v. Holder, 733 F.3d 662, 674-75 (7th Cir. 2013) (en banc) (rejecting "breadth of category" as grounds for denying a social group, citing to examples of large social groups, such as Jews in Nazi Germany and ethnic Tutsis during the Rwandan genocide).

Nor is our decision in Perez-Rabanales to the contrary. The proffered social group in that case was "Guatemalan women who try to escape systemic and severe violence but who are unable to receive official protection." Perez-Rabanales, 881 F.3d at 66. We found that the definition produced a group that was amorphous rather than particular. Id. It "potentially encompasses all women

- 22 -

in Guatemala."  Id. (emphasis added).  And the "potential" for finding an individual member turned on whether one fell "victim to violence and f[ound] herself unable to obtain official protection."  Id.  We never held -- or even said -- that "women" as a descriptor of a group lacked particularity or precludes determining who is in the group.

Courts have found appropriate certain large, particular social groups where the group is defined with reference to an underlying immutable characteristic.  See Perdomo, 611 F.3d at 669 (explaining that the Ninth Circuit has "rejected the notion that a persecuted group may simply represent too large a portion of a population to allow its members to qualify for asylum"); see also Malonga v. Mukasey, 546 F.3d 546, 553-54 (8th Cir. 2008) (rejecting the IJ's denial of petitioner's particular social group solely on the basis that his ethnic group was part of a tribe comprising forty-eight percent of the country's population).  In Kadri v. Mukasey, this circuit explained that sexual orientation, for example, "can serve as the foundation for a claim of persecution, as it is the basis for inclusion in a particular social group." 543 F.3d 16, 21 (1st Cir. 2008) (citing Karouni v. Gonzales, 399 F.3d 1163, 1172 (9th Cir. 2005)).  And in Silva v. Aschcroft, this circuit noted that a particular social group may refer to an innate characteristic such as gender.  394 F.3d 1, 5 (1st Cir. 2005).  As it explained, while "stand-alone social group claims are rather

rare" "[b]ecause the most obvious groups meeting [the protected category] criteria -- such as racial or ethnic groups -- are independently covered under the withholding of removal statute," when claims based on a particular social group are proffered, "they usually are based on discrete classes such as gender."[3]  Id.

Some courts in other circuits have also looked favorably upon the possibility of a broad social group based on gender.  See Ticas-Guillen v. Whitaker, 744 F. App'x 410, 410 (9th Cir. 2018) (mem.) (remanding to the BIA after finding that the "IJ's ground for denial -- that the proposed social group ["women in El Salvador"] was 'just too broad' to satisfy the 'particularity' requirement -- cannot stand" as "gender and nationality can form a particular social group"); Silvestre-Mendoza v. Sessions, 729 F. App'x 597, 598-99 (9th Cir. 2018) (mem.) (remanding to the BIA for consideration of whether "Guatemalan women" is a particular social group subsuming the petitioner's claimed narrower group); Paloka

---

[3] While not binding, guidance on the definition of a "refugee" provided by the United Nations High Commissioner for Refugees supports the possibility of a particular social group based on gender.  It explains that "[t]he size of the purported social group is not a relevant criterion in determining whether a particular social group exists within the meaning of Article 1A(2)" of the 1951 Refugee Convention. U.N. High Comm'r for Refugees, Guidelines on International Protection:  Membership of a particular social group within the context of Article 1A(2) of the 1951 Convention and/or Its 1967 Protocol Relating to the Status of Refugees," ¶ 18, U.N. Doc. HCR/GIP/02/02 (May 7, 2002); see INS v. Cardoza-Fonseca, 480 U.S. 421, 438-440, 439 n.22 (1987) (citing the Handbook on Procedures and Criteria for Determining Refugee Status (Geneva, 1979)).

v. Holder, 762 F.3d 191, 194 (2d Cir. 2014) (remanding to the BIA for consideration of the particular social groups of "unmarried women," "young women in Albania," and "unmarried young women in Albania"); Hassan, 484 F.3d at 518 (accepting a social group of "Somali females," and recognizing that "a factfinder could reasonably conclude that all Somali females have a well-founded fear of persecution based solely on gender given the prevalence of [female genital mutilation]").

For many of the foregoing reasons, at least one of the amici on this appeal urges us to rule as a matter of law that "Dominican women" can accurately describe a particular social group in this case.[4]  But De Pena's failure to assert such a group in the agency proceedings deprived the BIA of the opportunity to consider the wider group.  And the law generally calls for us to limit our holding to issues first presented to the BIA.  See Velerio-Ramirez v. Lynch, 808 F.3d 111, 117 (1st Cir. 2015) (citing Negusie v. Holder, 555 U.S. 511, 516 (2009), and noting that "when the BIA has not spoken on an issue that a statute has placed in its hands, remand is appropriate to give the BIA an opportunity to address the issue in the first instance"); see also Tillery v. Lynch, 821 F.3d 182, 186 (1st Cir. 2016) ("Our task is to review

---

[4] See Brief for Harvard Immigration & Refugee Clinic as Amicus Curiae Supporting Petitioner at 4.

the agency's legal interpretation, not perform it in the first instance.").

## III.

We therefore remand to the BIA for further proceedings consistent with this opinion. To the extent that the BIA on remand finds it appropriate or necessary to reach other grounds for denial cited by the IJ, or to remand the case to the IJ, nothing in this opinion prevents it from doing so.