# United States Court of Appeals
## For the First Circuit

No. 21-1431

JUAN JOSE ESPINOZA-OCHOA,

Petitioner,

v.

MERRICK B. GARLAND, Attorney General,

Respondent.

PETITION FOR REVIEW OF AN ORDER OF THE
BOARD OF IMMIGRATION APPEALS

Before

Gelpí, Howard, and Rikelman,
Circuit Judges.

Randy Olen for petitioner.

Robert D. Tennyson, Jr., Trial Attorney, Office of
Immigration Litigation, with whom Bryan Boynton, Acting Assistant
Attorney General, Civil Division, Paul Fiorino, Senior Litigation
Counsel, and Nancy E. Friedman, were on brief, for respondent.

December 27, 2023

**RIKELMAN**, <u>Circuit Judge</u>.  After a gang stole livestock from his farm in Guatemala and he reported the theft to the police, Juan Jose Espinoza-Ochoa began receiving death threats.  The threats continued even after he and his family moved repeatedly.  Fearing for his safety and the well-being of his family, Espinoza-Ochoa fled to the United States, where he was apprehended and applied for asylum and withholding of removal based on his status as a landowning farmer.  An Immigration Judge ("IJ") found him credible and concluded that his experiences at the hands of the gang and the police rose to the level of persecution.  But the IJ nevertheless denied Espinoza-Ochoa's application on the ground that he failed to establish that the persecution was motivated by a protected ground.  The Board of Immigration Appeals ("BIA") affirmed, and Espinoza-Ochoa petitioned this court for review.

His petition identifies two errors in the BIA's analysis.  First, Espinoza-Ochoa argues the BIA wrongly rejected his particular social group ("PSG") as impermissibly circular simply because he referred to the persecution he had experienced in describing his PSG.  Second, Espinoza-Ochoa argues that he established a causal nexus between the persecution he endured and his PSG and that the BIA erred by concluding otherwise.  We agree that Espinoza-Ochoa's proffered PSG is not circular.  A review of a PSG for legal validity must be based on a substantive analysis, not a superficial "quick look" at the words used.  Further, we

- 2 -

conclude that the BIA erred by failing to conduct a mixed-motive analysis in evaluating whether Espinoza-Ochoa's PSG was "one central reason" for his persecution. We therefore grant the petition, vacate the decision of the BIA, and remand for further proceedings.

## I. BACKGROUND

### A. Relevant Facts[1]

Juan Jose Espinoza-Ochoa was born in the Retalhuleu region of Guatemala and resided there until he fled to the United States in 2016. In 2004, Espinoza-Ochoa acquired a corn and cattle farm, where he worked and lived with his wife and children. One morning in February 2016, Espinoza-Ochoa discovered that a fence on his property had been cut and that two of his cows were missing. Vehicle tracks on the property suggested someone had stolen them. He filed a complaint with the police, who promised to investigate. But after a day passed and the police had done nothing, he and two friends began to search for the cattle on their own.

About eight days later, the group spotted one of the missing cows on land about forty minutes away. Espinoza-Ochoa recognized the cow because he had branded it with his initials.

---

[1] "We draw the relevant facts from the administrative record," including "testimony before the IJ . . . [that] the IJ found to be credible and corroborated." Barnica-Lopez v. Garland, 59 F.4th 520, 525 n.1 (1st Cir. 2023) (citing Adeyanju v. Garland, 27 F.4th 25, 31 (1st Cir. 2022)).

- 3 -

Once again, he called the police for help, and they said they would arrive within forty minutes. While he waited, Espinoza-Ochoa received repeated phone calls from an unknown caller asking for his location, which he feared were an attempt to find and harm him.

After several hours, the police arrived, as well as the owner of the property, whom Espinoza-Ochoa recognized as a member of a gang. The police initially resisted taking any action but faced growing pressure from friends and locals who had gathered at the scene. When the property owner could not prove that he had purchased the cow lawfully, the police arrested him. Then, amid the commotion, a child ran up to the suspect, telling him the "boss is saying you don't have to say anything, he's going to take you out of jail." Espinoza-Ochoa accompanied the police to the station, where he was questioned and required to produce personal documents.

The IJ credited Espinoza-Ochoa's testimony that he received multiple threats after he found his stolen cow. At least one threat came from the police: During Espinoza-Ochoa's questioning at the police station, an officer told him that the suspect was the officer's brother and warned Espinoza-Ochoa to "be careful wh[at] you are doing." After the events at the police station, a gang left threatening notes on the door of Espinoza-Ochoa's home. As Espinoza-Ochoa testified, he took these threats

- 4 -

seriously because local gangs had previously threatened and killed farm owners and their relatives after stealing their livestock in order to intimidate the landowners into abandoning their land or selling it at a depreciated price. He said he feared even letting his children go to school.

Amid the threats, Espinoza-Ochoa decided to abandon his farm and take his wife and children to his father's home in a town about an hour away. But the gang caught wind of Espinoza-Ochoa's movements and followed him to his father's town too. He and his family relocated again, this time to his sister's house, but Espinoza-Ochoa knew the gang was "still looking for [him]," and "knew they wouldn't stop." So Espinoza-Ochoa moved his family to yet another relative's house, and in early April 2016, he left Guatemala for the United States. Gang members still made death threats against Espinoza-Ochoa's wife, who remained in Guatemala with their young children, even after he had left the country. His family was forced to relocate two more times and remained in hiding at the time of his testimony before the IJ in 2019.

## B. Legal Proceedings

Espinoza-Ochoa entered the United States near Sasabe, Arizona on May 1, 2016. He was detained by the Department of Homeland Security and sat for a credible fear interview. After Espinoza-Ochoa explained many of the facts detailed above, an

- 5 -

asylum officer found him credible. He was then placed in removal proceedings and served with a notice to appear.

In the Boston Immigration Court, Espinoza-Ochoa applied for asylum based on membership in a PSG as well as withholding of removal and protection under the Convention Against Torture ("CAT"). In his application and during his testimony before the IJ, Espinoza-Ochoa recounted the theft of his livestock and the threats he received after he turned to the police. Three witnesses also provided corroborating testimony at a hearing in March 2019.

The IJ found that Espinoza-Ochoa was "a credible witness" after "observ[ing] [his] candor[,] . . . demeanor and responsiveness on the witness stand." Specifically, the IJ concluded that Espinoza-Ochoa was "truthful" about the harm he experienced, including that a gang member stole his livestock, that he received "credible threats of death from gang member[s] who he knew were capable of carrying out such threats," and that the gang members "acted with impunity" from the police. The IJ further found that "these threats" rose to the level of persecution.

Still, the IJ denied Espinoza-Ochoa's request for asylum for two reasons. First, the IJ concluded that his social group -- "land-owning farmer, who was persecuted for simply holding [the] position of farmer and owning a farm, by both the police and gangs in concert" -- was "impermissibly circular" because it "does

- 6 -

not exist independently of harm." According to the IJ, Espinoza-Ochoa's use of the words "who was persecuted" in describing his PSG meant the social group was "defined by the harm that [he] . . . received" and therefore was legally invalid.

Second, the IJ decided that Espinoza-Ochoa's persecution bore "no nexus to any enumerated [protected] ground" for seeking asylum because his status as a landowning farmer lacked a causal link to either the theft of the cattle or the death threats that followed. In the IJ's view, the "theft of livestock to force [Espinoza-Ochoa] to close his farm" was "generalized criminal activity" motivated by the gang's desire to "eventually take over the farmland and increase their profit and power in the area." Relying on since-vacated authority, the IJ explained that "generalized criminal activity . . . would not generally be a basis for asylum." See Matter of A-B-, 27 I. & N. Dec. 316, 317 (A.G. 2018), vacated, 28 I. & N. Dec. 307 (A.G. 2021). The IJ also concluded that the death threats, though credible, lacked a nexus to Espinoza-Ochoa's social group. The threats were driven by "revenge" for "report[ing] [the gang] to the police," the IJ concluded, not by a desire to harm landowning farmers. The IJ

accordingly denied Espinoza-Ochoa's asylum application and his application for withholding of removal.[2]

The BIA "adopt[ed] and affirm[ed]" the IJ's decision that, "even though [Espinoza-Ochoa] demonstrated the threats he received in Guatemala rose to the level of harm to constitute persecution," he was ineligible for asylum because "he did not demonstrate the persecution was on account of a protected ground." In adopting the IJ's legal analysis on circularity, the BIA agreed that Espinoza-Ochoa's PSG "is not . . . cognizable . . . because it does not exist independently from the harm [he] suffered." The agency also agreed that Espinoza-Ochoa "did not demonstrate a nexus to any enumerated ground" and that "the theft of two of [his] cattle and subsequent threats" were "criminal activities."[3] Thus, it affirmed the IJ's denials of withholding of removal and CAT protection as well. Espinoza-Ochoa timely petitioned this court for review.

---

[2] The IJ also denied Espinoza-Ochoa's request for protection under the CAT. Espinoza-Ochoa's briefing before us does not challenge that denial.

[3] Espinoza-Ochoa also argued to the BIA that he was persecuted on account of his political opinion, but, as the BIA noted, he did not raise that argument before the IJ. Nonetheless, the BIA stated that "opposition to a gang's criminal activities does not constitute a political opinion for purposes of establishing eligibility for asylum." Espinoza-Ochoa has expressly abandoned any argument based on political opinion in his petition.

## II.  STANDARD OF REVIEW

When the BIA adopts the IJ's decision but adds its own gloss, we "review the decisions of both the BIA and the IJ" together.  Aldana-Ramos v. Holder, 757 F.3d 9, 14 (1st Cir. 2014). We review the agency's legal conclusions de novo with "some deference to its interpretations of statutes and regulations related to immigration matters."  Id. (citing Matos-Santana v. Holder, 660 F.3d 91, 93 (1st Cir. 2011)).  We uphold factual findings unless the record compels a contrary conclusion.  Varela-Chavarria v. Garland, 86 F.4th 443, 449 (1st Cir. 2023).

## III. DISCUSSION

We begin with the legal framework governing the issues raised by Espinoza-Ochoa's petition.  An applicant for asylum must qualify as a "refugee" within the meaning of the Immigration and Nationality Act ("INA").  8 U.S.C. § 1158(b)(1)(A).  A refugee is someone "unable or unwilling to return [to] or to avail herself of the protection of her own country 'because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.'"  De Pena-Paniagua v. Barr, 957 F.3d 88, 92 (1st Cir. 2020) (quoting 8 U.S.C. § 1101(a)(42)(A)).  To satisfy the "on account of" requirement, the protected ground need not be the only reason for the harm the applicant suffered, but it must be "at least one central reason for [the] persecuti[on]."  8 U.S.C.

§ 1158(b)(1)(B)(i); accord Barnica-Lopez v. Garland, 59 F.4th 520, 528 (1st Cir. 2023).

A similar test applies to withholding of removal. "To obtain relief in the form of withholding of removal, an [applicant] must establish a clear probability that, if returned to his homeland, he will be persecuted on account of a statutorily protected ground." Sanchez-Vasquez v. Garland, 994 F.3d 40, 46 (1st Cir. 2021) (citing 8 U.S.C. § 1231(b)(3)(A)). To meet this standard, an applicant must prove "three discrete elements: a threshold level of past or anticipated serious harm, a nexus between that harm and government action or inaction, and a causal connection to one of the five statutorily protected grounds" under the asylum statute. Barnica-Lopez, 59 F.4th at 528 (quoting Sanchez-Vasquez, 994 F.3d at 46). Unlike asylum, withholding of removal requires "a clear probability of persecution," as opposed to "a well-founded fear," and an applicant's subjective fear is not relevant. See id. (first quoting Sanchez-Vasquez, 994 F.3d at 46, and then citing Aguilar-Escoto v. Sessions, 874 F.3d 334, 337-38 (1st Cir. 2017)). Due to the substantive similarities in the standards for asylum and withholding of removal claims, "'asylum precedents may be helpful in analyzing withholding-of-removal cases,' and vice versa." Id. (quoting Sanchez-Vasquez, 994 F.3d at 46).

Here, the IJ and BIA found, and the government does not dispute, that Espinoza-Ochoa credibly testified that he experienced harm and threats of harm in Guatemala that "constitute[d] persecution." But the agency concluded that Espinoza-Ochoa was still ineligible for asylum for two reasons. First, it held that Espinoza-Ochoa had failed to identify a valid PSG because the social group he delineated, "land-owning farmer, who was persecuted for simply holding [the] position of farmer and owning a farm, by both the police and gangs in concert," was impermissibly circular. Second, the IJ and BIA each held that, regardless of whether his asserted PSG was valid, the harm Espinoza-Ochoa experienced was "generalized criminal activity" and therefore was not on account of his social group.

We conclude that the BIA committed legal error in both its PSG and nexus analyses. We first explain why Espinoza-Ochoa's PSG was not circular and then evaluate whether his PSG was "at least one central reason" for the harm he suffered. Ultimately, we remand to the agency to reconsider both issues consistent with this opinion.

### A. The BIA erred by concluding that Espinoza-Ochoa's PSG was circular.

Under the BIA's well-established interpretation of the INA, an applicant seeking relief based on his membership in a PSG "must establish that the group is: (1) composed of members who

- 11 -

share a common immutable characteristic, (2) defined with particularity, and (3) socially distinct within the society in question."[4]  Paiz-Morales v. Lynch, 795 F.3d 238, 244 (1st Cir. 2015) (quoting Matter of M-E-V-G-, 26 I. & N. Dec. 227, 237 (B.I.A. 2014)).  The burden of showing membership in a legally cognizable group rests with the applicant.  See id. at 243-44.

The circularity rule resides in the social distinction requirement and reflects that an eligible PSG must "be perceived as a group by society," not merely by its persecutors.  M-E-V-G-, 26 I. & N. Dec. at 240 (citing In re C-A-, 23 I. & N. Dec. 951, 956-57 (B.I.A. 2006)).  Thus, "the persecutors' perception is not itself enough to make a group socially distinct," and "persecutory conduct alone cannot define the group."  Id. at 242 (citing Matter of A-M-E- & J-G-U-, 24 I. & N. Dec. 69, 74 (B.I.A. 2007)).  The relevant perspective is that of the rest of society.

The government argues that to avoid circularity, "[a] sufficiently distinct social group must exist independent of the persecution" the applicant suffered "and must have existed before

---

[4] Earlier opinions by the BIA and the courts of appeals referred to the social-distinction factor as "social visibility." See, e.g., Matter of S-E-G-, 24 I. & N. Dec. 579, 582 (B.I.A. 2008).  But the BIA has embraced the term "social distinction" to clarify that a proffered PSG lacking "ocular visibility" may still be valid as long as society recognizes that the group exists, citing as an example a group defined by sexual orientation.  Matter of M-E-V-G-, 26 I. & N. Dec. 227, 240 (B.I.A. 2014); see also De Pena-Paniagua, 957 F.3d at 95 (citing M-E-V-G-, 26 I. & N. Dec. at 236).

- 12 -

the alleged persecution began." Perez-Rabanales v. Sessions, 881 F.3d 61, 67 (1st Cir. 2018) (citing Burbiene v. Holder, 568 F.3d 251, 254 (1st Cir. 2009)); see also Rreshpja v. Gonzales, 420 F.3d 551, 556 (6th Cir. 2005). That is certainly a correct statement of the law, but the government interprets the relevant cases to stand for a rule that any reference to harm in the formulation of a PSG is fatal. The BIA agreed, embracing the IJ's statement that "the phrase 'who was persecuted' renders the particular social group invalid because it is defined by the harm" Espinoza-Ochoa had suffered.

But "the shared trait of persecution does not disqualify an otherwise valid social group." M-E-V-G-, 26 I. & N. Dec. at 243 (citing Cece v. Holder, 733 F.3d 662, 671 (7th Cir. 2013) (en banc)). Even though "a social group cannot be defined exclusively by the fact that its members have been subjected to harm," the BIA's decisions recognize that shared suffering "may be a relevant factor in considering the group's visibility in society." A-M-E- & J-G-U-, 24 I. & N. Dec. at 74 (emphasis added). That the persecutors view the group as distinct "can be indicative," though not determinative, "of whether society views the group as distinct." M-E-V-G-, 26 I. & N. Dec. at 242 (emphasis added). In some circumstances, "[t]he act of persecution . . . may be the catalyst that causes the society to distinguish" the group and "consider [it] . . . distinct." Id. at 243. That is

- 13 -

why "a social group determination must be made on a case-by-case basis" by reviewing the facts of each application, rather than based on a conclusory judgment that a PSG is circular per se. Id. at 242; accord A-M-E- & J-G-U-, 24 I. & N. Dec. at 74 (social distinction requires assessment of "the context of the country of concern and the persecution feared").

Giving due weight to the BIA's precedents, we have rejected invitations to treat the circularity rule as a "categorical" barrier to any PSG that references the suffering of its members. De Pena-Paniagua, 957 F.3d at 93-94. Instead, we have treated circularity in line with the general principle that "[w]hether a particular social group is cognizable is a 'fact-based inquiry made on a case-by-case basis,'" including "whether the group is . . . socially distinct in the relevant society." Varela-Chavarria, 86 F.4th at 452 (quoting Matter of W-Y-C- & H-O-B-, 27 I. & N. Dec. 189, 191 (B.I.A. 2018)); see also Paiz-Morales, 95 F.3d at 245 (quoting M-E-V-G-, 26 I. & N. Dec. at 251).

It is true that our cases have sometimes stated that "a social group cannot be defined by the claimed persecution." See, e.g., Hernandez-Mendez v. Garland, 86 F.4th 482, 490 (1st Cir. 2023); see also Perez-Rabanales, 881 F.3d at 67; Burbiene, 568 F.3d at 254. But even in those cases, our analysis reflected the legal standard as we reaffirm it today: that a social group cannot be defined "only" by harm, Perez-Rabanales, 881 F.3d

- 14 -

at 67 (quoting Escobar v. Holder, 657 F.3d 537, 545 (7th Cir. 2011)), and must share a common characteristic "other than" the "risk of being persecuted," Burbiene, 568 F.3d at 254 (quoting Rreshpja, 420 F.3d at 556).

Circularity issues often have surfaced in cases addressing gender-based violence and domestic abuse. In De Pena-Paniagua v. Barr, the BIA had held that the PSG "Dominican women unable to leave . . . a relationship with the man who abuses them" was circular because the inability to leave a relationship was part of the persecution the women experienced. 957 F.3d at 92-93. On petition to this court, we reversed the BIA for treating "the circularity [rule] as categorical." Id. at 93. We concluded that the "categorical rejection of any group defined by its members' inability to leave relationships with their abusers" was "arbitrary." Id. We could discern "no logic or reason behind the assertion that abuse cannot do double duty, both helping to define the group[] and providing the basis for a finding of persecution." Id. at 94. On remand, we directed the BIA to "consider, at least, whether the proffered groups exist and in fact satisfy the requirements for constituting a particular social group." Id. Put differently, the BIA had to examine the facts of the specific case, not just the language used to articulate the PSG.

We applied similar principles to reach the opposite result in Perez-Rabanales v. Sessions. There, we affirmed the

- 15 -

BIA's dismissal because the applicant had not introduced evidence indicating that members of the social group "Guatemalan women who try to escape systemic and severe violence but who are unable to receive official protection" shared any socially distinguishing characteristic other than "the[ir] persecution."[5]  881 F.3d at 67; see also De Pena-Paniagua, 967 F.3d at 93-94 (discussing Perez-Rabanales).

Our sister circuits also have recognized that whether a PSG is circular cannot be based only on an applicant's word choice in delineating their PSG.[6]  See, e.g., Grace v. Barr, 965 F.3d 883, 904 (D.C. Cir. 2020).  The Court of Appeals for the Ninth Circuit, for example, requires the BIA to strike the circular language and "consider whether a petitioner's social group is cognizable if it is defined without reference to the fact of persecution."  Diaz-

_____

[5] We also concluded that the "amorphous nature" of the group "render[ed] the group insufficiently particular."  Perez-Rabanales, 881 F.3d at 66.

[6] Despite the government's suggestion to the contrary at oral argument, we can locate no circuit in which a facially circular PSG could not be found valid based on evidence that the relevant society viewed the group as distinct.  See, e.g., Jaco v. Garland, 24 F.4th 395, 399, 406-07 (5th Cir. 2021) (holding "Honduran women unable to leave their relationships" was not cognizable because it was defined by the harm suffered and the applicant had failed to show that Honduran society perceived such women as a distinct group within society); Lushaj v. Holder, 380 F. App'x 41, 43 (2d Cir. 2010) (same for "women whom members of the Haklaj gang wished to kidnap and force into prostitution, at least in part to punish their family members for their political activities in Albania" (alterations and internal quotation marks omitted)).

- 16 -

Reynoso v. Barr, 968 F.3d 1070, 1080-81 (9th Cir. 2020). We agree that "it is not fair" to evaluate a PSG based merely on a cursory assessment of the words used. Grace, 965 F.3d at 904 (quoting Cece, 733 F.3d at 672).

A review of a PSG for legal validity must be based on a substantive analysis, not a superficial "quick look." The adjudicator must "determin[e] what underlying characteristics account for the fear and vulnerability" of the group, and whether the society views those characteristics as distinct. Id. (quoting Cece, 733 F.3d at 672). For example, "Salvadoran women who are unable to leave their domestic relationships where they have children in common with their partners" is a group that "appears to be defined in part by the alleged harm." Id. (quoting A-B-, 27 I. & N. Dec. at 321). But if those women's "inability to leave [their] relationship[s] stems from circumstances independent of the alleged harm -- for example, legal constraints on divorce -- then the group would not be circular because the 'inability to leave' does not refer to harm at all." Id. (quoting De Pena-Paniagua, 957 F.3d at 93-94).

In sum, the BIA, this court, and our sister courts agree that a PSG's reference to harm does not, on its own, resolve its legal validity. Instead, further analysis is necessary to evaluate whether the putative group shares other socially distinctive characteristics. One way to satisfy that requirement is to strike

the circular language and re-evaluate the PSG, see Diaz-Reynoso, 968 F.3d at 1080-81, though other modes of inquiry may also suffice.

The BIA and IJ failed to conduct that substantive analysis here. Instead, they looked at the words used to describe the PSG and then ended their review. That limited analysis is inconsistent with binding First Circuit precedent. See De Pena-Paniagua, 957 F.3d at 93-95.

The government disagrees, arguing that our statement in Perez-Rabanales that "[a] sufficiently distinct social group must exist independent of the persecution claimed to have been suffered" requires affirmance here. 881 F.3d at 67. But the government misunderstands our holding in that case. As we have already explained, Perez-Rabanales did not state that any PSG that includes a reference to the persecution of its members fails as a matter of law. Rather, it affirmed the BIA because the applicant had not introduced any facts showing that her PSG was socially distinct. Id. In other words, Perez-Rabanales treated circularity as a case-specific inquiry, consistent with the steady drumbeat of BIA, First Circuit, and other federal precedent cited above, not as a categorical bar to any social group that references harm. And the government's brief does not even cite, let alone contend with, our subsequent explicit rejection of the categorical approach to circularity in De Pena-Paniagua. See 957 F.3d at 93-94.

- 18 -

Further undermining the government's position, BIA and circuit court precedent supports the view that "landowning farmers" can be a valid PSG.  To be sure, "landownership does not automatically confer membership in a particular social group in all instances."  Turcios-Flores v. Garland, 67 F.4th 347, 355 (6th Cir. 2023); accord M-E-V-G-, 26 I. & N. Dec. at 241.  But it is well-established that landowners may have the necessary social distinction to qualify as a PSG.  See A-M-E- & J-G-U-, 24 I. & N. Dec. at 74; M-E-V-G-, 26 I. & N. Dec. at 241 (landownership may satisfy "social distinction" requirements in "an underdeveloped, oligarchical society").  The BIA has made clear that "land ownership" is an "easily recognizable trait[]" that can form the basis of a PSG.  In re C-A-, 23 I. & N. Dec. at 960.  As the Ninth Circuit has explained, "the easy recognition of landownership" is not "changed when a petitioner proposes additional characteristics," like operating a farm on the land, "that other landowners may or may not share."  Cordoba v. Holder, 726 F.3d 1106, 1117 (9th Cir. 2013); see also N.L.A. v. Holder, 744 F.3d 425, 439 (7th Cir. 2014) (upholding as cognizable: "Colombian land owners who refuse to cooperate with the FARC"); Tapiero de Orejuela v. Gonzales, 423 F.3d 666, 672-73 (7th Cir. 2005) (upholding as cognizable: "educated, landowning class of cattle farmers targeted by FARC").  And BIA precedent indicates that "landowning farmers" may satisfy immutability and particularity standards too.  See

*Matter of Acosta*, 19 I. & N. Dec. 211, 233-34 (B.I.A. 1985) (describing the immutability standard), *overruled in part on other grounds by* *Matter of Mogharrabi*, 19 I. & N. Dec. 439, 441 (B.I.A. 1987); *Turcios-Flores*, 67 F.4th at 355 (holding that "Honduran rural landowners" shared a "common fundamental characteristic" and therefore satisfied the immutability standard); *M-E-V-G-*, 26 I. & N. Dec. at 241 (explaining that "landowners" may satisfy the particularity standard); *Cordoba*, 726 F.3d at 1117 (holding that "wealthy, educated landowners" was particularized and not overbroad); *cf.* *De Pena-Paniagua*, 957 F.3d at 96-97 (concluding that PSGs constituting large portions of the population can still satisfy particularity).

Espinoza-Ochoa also introduced case-specific facts that could support finding that landowning farmers in Guatemala are socially distinct. To evaluate whether a PSG is socially distinct, the BIA has said it considers, among other relevant facts: (i) "whether the society in question recognizes the need to offer protection to victims of [the persecution], including whether the country has criminal laws designed to protect [persecution] victims"; (ii) "whether those laws are effectively enforced"; (iii) "documented country conditions"; (iv) "law enforcement statistics and expert witnesses"; and (v) "the respondent's past experiences." *Matter of A-R-C-G-*, 26 I. & N. Dec. 388, 394-95 (B.I.A. 2014), *overruled by* *A-B-*, 27 I. & N. Dec. at 321, *vacated*,

28 I. & N. Dec. at 307 (reinstating A-R-C-G-). The record here contains evidence favorable to Espinoza-Ochoa along several of these factors. He offered testimony and introduced documentary country-conditions evidence showing that Guatemalan landowners face "unclear property rights" and are often "forcibly removed" from their farms, as well as a U.S. State Department report from 2016 assessing that Guatemala lacks "[]effective mechanisms to address land conflicts." The country-conditions evidence also explained that legislation to protect farmers had faced political opposition from agribusiness and described an initiative urging the government to restore the land of dispossessed farm owners. Finally, Espinoza-Ochoa testified that family members and employees of farm owners in his own community had been murdered after the owners refused to give up their land to the gangs -- and that he had received grave threats too.

We leave it to the BIA to decide in the first instance whether Espinoza-Ochoa's social group is socially distinct in Guatemalan society, consistent with this opinion. See Aldana-Ramos, 757 F.3d at 16 (remanding due to legal error where facts "d[id] not preclude and would even allow the BIA to find" a cognizable PSG). But for the reasons explained above, we conclude that the agency committed clear legal error by treating the circularity standard as categorical. If an applicant's proffered social group, examined without consideration of the potentially

circular language, shares independent socially distinctive characteristics, then neither the IJ nor the BIA may reject the group as legally invalid without further substantive analysis. On remand, the BIA must consider whether the social group of "landowning farmers" in Guatemala is cognizable under the correct legal standard. De Pena-Paniagua, 957 F.3d at 94, 95-96.

### B. The BIA erred by failing to consider whether being a landowning farmer was "one central reason" for the persecution Espinoza-Ochoa experienced.

In addition to demonstrating membership in a protected group, an asylum applicant must also show that his persecution was "on account of" that protected ground, 8 U.S.C. § 1101(a)(42)(A), meaning that the protected ground was "at least one central reason" for the persecution, id. § 1158(b)(1)(B)(i) (emphasis added). The burden on Espinoza-Ochoa here was to "establish that he had been targeted on a protected basis." M-E-V-G-, 26 I. & N. Dec. at 250 (emphasis added).

As its language makes clear, the "one central reason" test "does not require an asylum applicant to demonstrate that he was singled out only due to his protected trait." Barnica-Lopez, 59 F.4th at 531 (internal quotation marks omitted) (quoting Enamorado-Rodriguez v. Barr, 941 F.3d 589, 596 (1st Cir. 2019)). Relief is still proper even if one reason -- perhaps even the primary reason -- for the persecution is not a basis for asylum, "so long as one of the statutory protected grounds is 'at least

one central reason' for the persecution." Aldana-Ramos, 757 F.3d at 18 (quoting 8 U.S.C. § 1158(b)(1)(B)(i)).

Accordingly, for Espinoza-Ochoa to prevail on a mixed-motive theory, he "need not prove that a protected ground was the most important reason" that the gang and the police persecuted him. Enamorado-Rodriguez, 941 F.3d at 596 (quoting Parussimova v. Mukasey, 555 F.3d 734, 740 (9th Cir. 2009)). Rather, Espinoza-Ochoa must show only that being a landowning farmer was not "incidental, tangential, superficial, or subordinate to another reason for [the] harm." Barnica-Lopez, 59 F.4th at 531 (quoting Sanchez-Vasquez, 994 F.3d at 47). Thus, just because the agency finds that persecutors were motivated by a non-protected ground does not end the inquiry. "[T]he [immigration] statute require[s]" the agency to "utilize a mixed-motive or 'at least one central reason' analysis." Enamorado-Rodriguez, 941 F.3d at 596 (emphasis added).

For example, the asylum applicant in Enamorado-Rodriguez alleged that he was beaten by his paternal grandparents because they hated his mother, citing his nuclear family as his social group. See id. at 594-95. The IJ found him credible and concluded that the domestic violence rose to the level of persecution. See id. But the IJ also found, and the BIA affirmed, that the beatings were likely on account of his "grandparents' conception of masculinity," or a reflection of how they had been treated by

- 23 -

elders during their own childhoods, not hatred of his mother. Id. at 595. The BIA explained that even though Enamorado had "posit[ed] a plausible alternative motive to the one[s] found by the IJ," that showing was "insufficient to demonstrate clear error." Id. But on review, we held that the BIA had erred as a matter of law "by failing to consider whether Enamorado's persecution had mixed motivations," in particular, "whether, despite the possible presence of another motivation, Enamorado's membership in his mother's family was at least one central reason for his persecution." Id. at 596.

The agency proceedings here ran afoul of the obligations under Enamorado-Rodriguez. "Nothing in the IJ's ruling" or the BIA's decision suggests "that [it] utilized a mixed motive . . . analysis" or considered whether being a landowning farmer "was at least one central reason for [Espinoza-Ochoa's] persecution." Id. Critically, the words "mixed motive" and "one central reason" do not appear at all in the decisions below (or in the government's briefing before us). Instead, the IJ merely concluded that cattle theft was "generalized criminal activity and . . . would not generally be a basis for asylum," suggesting that the gang's motivation was greed and wealth.[7] It then found that the gang's

---

[7] The BIA and IJ cited the since-vacated decision in Matter of A-B- for support. A-B- stated that the harm befalling "victims of private criminal activity," including "victims of gang

- 24 -

threats to kill Espinoza-Ochoa were not "on account of" a protected ground either; the gang was motivated by "revenge" against Espinoza-Ochoa for calling the police, not an effort to force a cheap sale of his farmland.

"Even on its own terms," the agency's conclusion that Espinoza-Ochoa's persecution was motivated by the greedy desire to obtain his valuable property, or by revenge, "does not itself exclude" the possibility that his ownership of a farm was "at least one of the central reasons" for his persecution. Id. at 596-97 (internal quotation marks omitted) (citation omitted). For example, we have rejected the argument that just because an applicant's "wealth is one reason for the alleged persecution," then "a protected ground . . . cannot be as well." Aldana-Ramos, 757 F.3d at 18.

So, too, with revenge. Our precedent has "long 'viewed disputes motivated by revenge as personal in nature.'" Barnica-

violence," will usually lack a nexus to a PSG because "membership in a purported particular social group 'is often not a central reason for the threats received'" during ordinary crime, "but rather is secondary to a grander pattern of criminal extortion." 27 I. & N. Dec. at 317, 322-23 (quoting Velasquez v. Sessions, 866 F.3d 188, 199 (4th Cir. 2017) (Wilkinson, J., concurring)). It explained that "private criminals are motivated more often by greed or vendettas than by an intent to overcome the protected characteristic of the victim." Id. (alterations and internal quotation marks omitted) (quoting In re Kasinga, 21 I. & N. Dec. 357, 365 (B.I.A. 1996)). We infer from the BIA and IJ's citations to A-B- that they believed the gangs were motivated by financial gain, not Espinoza-Ochoa's social group.

- 25 -

Lopez, 59 F.4th at 531 (quoting Marin-Portillo v. Lynch, 834 F.3d 99, 101 (1st Cir. 2016)). "'[P]ersonal disputes are generally not enough to show the required nexus' between past harm and a protected ground." Id. (quoting Sompotan v. Mukasey, 533 F.3d 63, 71 (1st Cir. 2008)); but see In re C-A-, 23 I. & N. Dec. at 959 (suggesting that a former police officer could claim asylum if targeted for "having served as [a] police officer[]" but would lack nexus if targeted in revenge for "disrupting particular criminal activity"). But as the Ninth Circuit has said, and we agree, "even if revenge partially motivate[s]" a persecutor's mistreatment of an applicant, record evidence can nonetheless indicate that the applicant's PSG may be "another central reason for the persecution." Madrigal v. Holder, 716 F.3d 499, 506 (9th Cir. 2013); see also Aldana-Ramos, 757 F.3d at 18-19.

We find that the BIA committed legal error by failing to consider whether Espinoza-Ochoa's status as a landowning farmer was a central reason for his persecution. The BIA's error is particularly notable considering the record before it, which contained ample findings by the IJ, and "testimony[] deemed credible by the IJ," to support Espinoza-Ochoa's nexus argument. Enamorado-Rodriguez, 941 F.3d at 596.

After all, the IJ's own factual findings concluded that the gangs specifically targeted landowning farmers and stole their livestock to pressure them to give up their land. These findings

and other record evidence could support a finding that Espinoza-Ochoa "was more likely to be persecuted by the gang on account of a protected ground than was any other member of society." M-E-V-G-, 26 I. & N. Dec. at 250 (citing Matter of S-E-G-, 24 I. & N. Dec. 579, 587 (B.I.A. 2008)). Espinoza-Ochoa offered uncontradicted testimony that the racketeering scheme involved two components, summarized in his appellate briefing: "The gangs subjected the farmers to activities designed to both reduce the value of their properties, as well as to intimidate them to sell their farms to . . . 'investors' at reduced prices." He testified that he was not the first target of the scheme, and that the gang had previously resorted to murder to intimidate farm owners to sell or abandon their land. So, when the death threats came for Espinoza-Ochoa, he believed these threats were credible, as reflected in the IJ's findings. The gang also pursued and issued death threats against Espinoza-Ochoa, his wife, and his children even after Espinoza-Ochoa had abandoned the farm, and his family remained in hiding for years after he left Guatemala. See Villalta-Martinez v. Sessions, 882 F.3d 20, 25 (1st Cir. 2018) (remand for mixed-motive analysis was appropriate where a family unit "was targeted for persecution even after their financial resources were exhausted").

If on remand the IJ finds that landowning farmers are a cognizable PSG, then it should consider in the first instance

whether that PSG was "one central reason" why the gang targeted Espinoza-Ochoa. Enamorado-Rodriguez, 941 F.3d at 596. Because the BIA has not yet considered whether Espinoza-Ochoa's status as a landowning farmer "was . . . a central factor behind the persecution" he experienced, we remand that question to the agency and "simply observe that the record is more than sufficient to allow such a finding."[8] Aldana-Ramos, 757 F.3d at 19.

## IV. CONCLUSION

For all these reasons, we agree with Espinoza-Ochoa that legal error infected both the PSG and nexus analyses below. Accordingly, we **GRANT** the petition, **VACATE** the decision below, and **REMAND** for further proceedings consistent with this opinion.

---

[8] Moreover, if the agency concludes that Espinoza-Ochoa has met his burden of showing past persecution and is thus entitled to a presumption of a well-founded fear of future persecution, the agency should consider on remand whether the government has put forth sufficient evidence to overcome that presumption. See Olmos-Colaj v. Sessions, 886 F.3d 168, 180 (1st Cir. 2018) (Barron, J., concurring in part).