# United States Court of Appeals
## For the First Circuit

No. 25-1267

ROSA LIDIA CANTE MIJANGOS,

Petitioner,

v.

PAMELA J. BONDI, Attorney General,

Respondent.

PETITION FOR REVIEW OF AN ORDER OF
THE BOARD OF IMMIGRATION APPEALS

Before

Barron, Chief Judge,
Kayatta and Rikelman, Circuit Judges.

Lidia M. Sanchez, for petitioner.

Marie V. Robinson, Attorney, U.S. Department of Justice, Office of Immigration Litigation, with whom Brett A. Shumate, Assistant Attorney General, Civil Division, and Cindy S. Ferrier, Assistant Director, Office of Immigration Litigation, were on brief, for respondent.

February 18, 2026

**RIKELMAN**, <u>Circuit Judge</u>.  Petitioner Rosa Lidia Cante Mijangos, a citizen of Guatemala, suffered sexual and physical abuse at the hands of her former intimate partner for years. Fearing for her safety, she fled to the United States in 2014 and eventually applied for asylum and withholding of removal.  <u>See</u> 8 U.S.C. §§ 1158(b)(1), 1231(b)(3).  The Immigration Judge (IJ) rejected her claims after concluding that Cante Mijangos had failed to show the required connection or "nexus" between the harm she experienced and her asserted protected status as a "Guatemalan woman who was unable to effectively leave a domestic relationship." Instead, the IJ found that her ex-partner abused her because of his generally violent nature.  The Board of Immigration Appeals (BIA) affirmed, and Cante Mijangos petitioned our Court for review. Although we do not minimize the harm that Cante Mijangos experienced, we must deny the petition because she has failed to develop any challenge to the legal and factual bases for the BIA's ruling.

## I. BACKGROUND

### A. Relevant Facts[1]

Cante Mijangos began a relationship with her former partner, Walter, in 2007.  Three years later, in 2010, Walter began

---

[1] "We draw the facts from the administrative record, including [Cante Mijangos's] testimony before the IJ."  <u>Khalil</u> v. <u>Garland</u>, 97 F.4th 54, 59 n.1 (1st Cir. 2024) (quoting <u>Caz</u> v. <u>Garland</u>, 84 F.4th 22, 25 n.2 (1st Cir. 2023)).

abusing her emotionally, physically, and sexually. When he was away, Walter prevented Cante Mijangos from leaving their home by chaining and padlocking the front door and placing bars on the windows. He also removed her phone so that she could not communicate with anyone and left her with insufficient food. Further, Walter repeatedly sexually abused Cante Mijangos, and she eventually became pregnant as a result of that abuse. His abuse continued during her pregnancy, including a beating when she was seven months pregnant that left her unconscious for most of the night and resulted in a ten-day hospital stay. During a follow-up medical visit, Cante Mijangos informed a doctor about the abuse, but he said that he could not help her.

Towards the end of Cante Mijangos's pregnancy, Walter moved her to a different residence where she was constantly monitored. When she was ready to give birth, Walter brought her to a new hospital because he had discovered that she had alerted a doctor at the previous hospital about his abusive conduct. After Cante Mijangos gave birth, she remained at the residence where she was closely watched, and Walter often left her without enough food for herself and her daughter. Walter also continued to physically abuse her. In one episode, after Cante Mijangos asked if she could visit her parents, Walter attacked her with a knife, scarring her leg. In another violent episode, Walter swung a machete at her head. She blocked the machete with her hand, leaving her with

more permanent scars.  Walter also abused their daughter, including by burning the child's feet with a cigarette to "shut her up." Cante Mijangos testified before the IJ that she did not seek help from the police because Walter threatened to harm her if she did.

Cante Mijangos eventually escaped from Walter with the help of a neighbor, fleeing with her daughter to her parents' house and then to her brother's home.  Although Walter tracked Cante Mijangos to her parents' house, her mother told him that she did not know where Cante Mijangos had moved.  Fearing that Walter would soon find her and harm her, Cante Mijangos decided to leave Guatemala.  She entered the United States in March 2014.  Her daughter remains in Guatemala with Cante Mijangos's parents.

In 2017, Walter tried to remove his daughter from her maternal grandparents' house by force.  Although Cante Mijangos's brother prevented him from abducting the child, Walter assaulted and injured the brother with a machete.  Police officers responded to the family's report of the attack, but they did not conduct a search for Walter and never arrested him.  Cante Mijangos's parents and brother have not seen Walter since this 2017 attack, and Cante Mijangos confirmed to the IJ that she has no information about Walter's whereabouts.

## B. Procedural History

After the Department of Homeland Security initiated removal proceedings against Cante Mijangos, she applied for

asylum, withholding of removal, and protection under the Convention Against Torture.[2]   See 8 U.S.C. §§ 1158(b)(1), 1231(b)(3); 8 C.F.R. § 1208.16.  During her hearing before the IJ, she asserted that she qualified for asylum and withholding of removal based on her membership in the particular social group (PSG) of "Guatemalan women unable to leave a domestic relationship."  She confirmed that she was relying on "just that one group."

The IJ ultimately denied all relief.  Although noting that Cante Mijangos had "suffered unspeakable abuse in Guatemala," the IJ found parts of her testimony to be of "questionable credibility."

Putting credibility aside, the IJ also determined that Cante Mijangos had failed to show the required nexus between the harm she experienced in Guatemala and any protected ground under the immigration statutes.  The IJ found that, even assuming the PSG asserted by Cante Mijangos was legally cognizable, there was no "nexus" between Walter's abuse and her PSG.  According to the IJ, although the record demonstrated that Walter was a "violent, dangerous[,] and abusive man," there was no indication that he abused Cante Mijangos to "punish [her] for holding a

---

[2] Cante Mijangos has waived any challenge to the agency's rejection of her claim for protection under the Convention Against Torture by failing to present any developed argument on that claim.

characteristic" that he sought "to overcome." In support of that finding, the IJ pointed out that Walter did not abuse Cante Mijangos in the first years of their relationship and that he was also violent towards his own daughter and Cante Mijangos's brother. Thus, the IJ determined that Walter was an "uncontrolled abuser" and was not motivated to harm Cante Mijangos because of her asserted PSG.

Although the no-nexus finding was dispositive of Cante Mijangos's asylum and withholding of removal claims, the IJ rejected those claims on other grounds as well. For example, the IJ concluded that Cante Mijangos had failed to establish that the Guatemalan government was unable or unwilling to protect her from Walter.

The BIA affirmed the IJ's decision in March 2025. Assuming that Cante Mijangos had testified credibly, the BIA nevertheless upheld the IJ's finding that Walter had not been motivated to persecute Cante Mijangos because of her asserted PSG. The BIA expressly concluded that there was no clear error in the IJ's determination that Walter's actions were "due to his uncontrolled abusive nature," not on account of any protected ground, and thus Cante Mijangos could not satisfy the nexus requirement. It also discerned no clear error in the IJ's other findings, including that Cante Mijangos had failed to demonstrate

that the Guatemalan government was unable or unwilling to protect her from Walter.

Cante Mijangos timely filed a petition for review.

## II. STANDARD OF REVIEW

Although our review is focused on the final decision of the BIA, "'to the extent that the BIA deferred to or adopted the IJ's reasoning, we review those portions of the IJ's decision' as well." Ferreira v. Garland, 97 F.4th 36, 45-46 (1st Cir. 2024) (quoting Chavez v. Garland, 51 F.4th 424, 429 (1st Cir. 2022)). "We uphold factual findings under the substantial evidence standard unless the record compels a contrary conclusion." Id. at 46. We review legal conclusions de novo. See Alves v. Bondi, 128 F.4th 297, 298 (1st Cir. 2025). When discussing the decisions of the BIA and the IJ "as a unit," we refer to them as "the agency." Khalil v. Garland, 97 F.4th 54, 61 (1st Cir. 2024).

## III. DISCUSSION

### A. Legal Standard

An applicant for asylum must qualify as a "refugee" under the Immigration and Nationality Act (INA). See 8 U.S.C. § 1158(b)(1)(A). The INA defines a refugee as someone who is "unable or unwilling to return [to] or to avail herself of the protection of her own country 'because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political

- 7 -

opinion.'" De Pena-Paniagua v. Barr, 957 F.3d 88, 92 (1st Cir. 2020) (quoting 8 U.S.C. § 1101(a)(42)(A)). Additionally, when an individual is seeking asylum based on past or future harm by a private actor, they must also show that the government was unable or unwilling to protect them from that harm. See Medina-Suguilanda v. Garland, 121 F.4th 316, 322 (1st Cir. 2024).

To establish that persecution is "on account of" a protected ground -- the so-called nexus requirement -- an individual must show that the protected ground is "at least one central reason for [the] persecuti[on]." See Espinoza-Ochoa v. Garland, 89 F.4th 222, 230 (1st Cir. 2023) (alterations in original) (quoting 8 U.S.C. § 1158(b)(1)(B)(i)). "The 'one central reason' test does 'not require an . . . applicant to demonstrate that [she was] singled out only due to [her] protected trait." Khalil, 97 F.4th at 62 (quoting Barnica-Lopez v. Garland, 59 F.4th 520, 531 (1st Cir. 2023)). "Instead, the test 'contemplates the possibility that multiple motivations can exist.'" Id. (quoting Aldana-Ramos v. Holder, 757 F.3d 9, 18-19 (1st Cir. 2014)). To prevail on a mixed-motive theory, the applicant must show that their protected trait "was not incidental, tangential, superficial, or subordinate to another reason for [the] harm." Id. at 63 (alteration in original) (internal quotation marks omitted) (quoting Espinoza-Ochoa, 89 F.4th at 235).

"A similar test applies to withholding of removal." Espinoza-Ochoa, 89 F.4th at 230. To obtain this form of relief, an applicant "must establish a clear probability that, if returned to [their] homeland, [they] will be persecuted on account of a statutorily protected ground." Id. (quoting Sanchez-Vasquez v. Garland, 994 F.3d 40, 46 (1st Cir. 2021)); see 8 U.S.C. § 1231(b)(3)(A). Thus, like the asylum statute, the withholding of removal statute requires a showing of nexus between any past or future harm and a protected ground. See Espinoza-Ochoa, 89 F.4th at 230. But the "clear probability" standard for withholding of removal is even harder to meet than the "well-founded fear" standard required for asylum. See id.

## B. Analysis

Our analysis begins and ends with waiver.

The BIA's decision focuses on the nexus requirement. Specifically, the BIA concluded that the IJ did not clearly err in finding that Cante Mijangos had failed to establish any nexus between the persecution she experienced in Guatemala and her asserted PSG. Thus, the BIA affirmed the IJ's determination that "the abuse [Cante Mijangos] suffered" was "motivated by her former partner's violent and abusive nature" rather than "any desire to overcome a characteristic of" her asserted PSG.

Yet, in her petition, Cante Mijangos fails to grapple with this critical ruling by the BIA. Although she asserts that

- 9 -

"the record compels the conclusion that she suffered past persecution . . . on account of being a Guatemalan woman," and refers to her testimony regarding the abuse she experienced "at the hands of her ex-partner," she fails to advance any record-based argument connecting Walter's abuse to her asserted PSG. Nor does she lodge a legal challenge to the IJ's application of our mixed-motive precedent.

To be sure, Cante Mijangos contends in her petition that the agency erred when it did "not explain why the harm and abuse" she experienced "was not sufficiently related to her status as a Guatemalan woman that was subjected to gender and sexual violence due to her membership in this particular group." But the remainder of her petition does not develop this contention with any legal or factual support whatsoever. Our precedent makes clear that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (holding an issue waived when not fully raised in the opening brief).

Instead of addressing the basis for the agency's ruling, Cante Mijangos focuses her petition on a separate issue: the legal cognizability of her asserted PSG. The only substantial argument Cante Mijangos makes in her petition is that the group "Guatemalan women" is immutable, particular, and socially distinct, citing to evidence of gender-based violence in Guatemala. But whether

"Guatemalan women" is a legally valid PSG is not at issue in this case.[3]

And, regardless of the asserted PSG, Cante Mijangos's failure to make any developed argument as to why the agency's nexus determination was incorrect is necessarily fatal to her claims. "Without a sufficient showing as to nexus, the harm [Cante Mijangos] suffered or fears suffering isn't a ground for asylum." Pazine v. Garland, 115 F.4th 53, 58 (1st Cir. 2024); see Alves, 128 F.4th at 299. As such, her "asylum claim . . . fail[s] right out of the gate." Pazine, 115 F.4th at 58. Her failure to challenge the agency's nexus ruling also dooms her withholding of removal claim. See Gonzalez-Arevalo v. Garland, 112 F.4th 1, 12 (1st Cir. 2024) (holding an applicant who cannot meet the asylum standard will necessarily fail under the higher standard for withholding of removal). Although the agency rejected Cante Mijangos's claims on other grounds as well, we need go no further in our review. See Alves, 128 F.4th at 299.

## IV. CONCLUSION

For all these reasons, we **deny** the petition for review.

---

[3] Before the agency, Cante Mijangos offered the PSG of "Guatemalan women [who are] unable to leave a domestic relationship." In her petition to us, however, Cante Mijangos asserts the PSG of "Guatemalan women." Because we deny her petition on other grounds, we do not address the implications of the different framing of her asserted PSG before our Court.