# United States Court of Appeals
## For the First Circuit

No. 23-1426

PRINCE BELO PAYE,

Petitioner,

v.

MERRICK B. GARLAND, Attorney General,

Respondent.

PETITION FOR REVIEW OF AN ORDER OF
THE BOARD OF IMMIGRATION APPEALS

Before

Barron, Chief Judge,
Gelpí and Rikelman, Circuit Judges.

SangYeob Kim, with whom Gilles Bissonnette, Margaret Moran, American Civil Liberties Union of New Hampshire, and New Hampshire Legal Assistance were on brief, for petitioner.

Andrew N. O'Malley, Senior Litigation Counsel, Office of Immigration Litigation, with whom Brian M. Boynton, Principal Deputy Assistant Attorney General, Civil Division, and Cindy S. Ferrier, Assistant Director, Office of Immigration Litigation, were on brief, for respondent.

Daniel V. Ward, Marianne Staniunas, Abigail Alfaro, Michelle Marie Mlacker, Colleen Roberts, and Ropes & Gray LLP were on brief for Immigration Law Professors and Former Immigration Judges and Board of Immigration Appeals Members, amici curiae.

July 17, 2024

**GELPÍ, Circuit Judge.** Petitioner Prince Belo Paye ("Paye") seeks review of a final order of removal issued by the Board of Immigration Appeals ("BIA"). The BIA upheld the Immigration Judge's ("IJ") conclusion that Paye did not demonstrate past persecution necessary for relief under the withholding-of-removal statute, 8 U.S.C. § 1231. Paye appeals, raising a litany of alleged errors.

We agree with him in part. The BIA and IJ (collectively, "the agency") did not address whether Paye's escape from Liberia because of systematic ethnic cleansing and genocide of the Krahn people during the Liberian civil war constituted past persecution. This hindered our ability to meaningfully review the agency's denial of withholding of removal. Accordingly, we vacate and remand.

## I. BACKGROUND[1]

### A. Factual Background

A civil war raged in Liberia throughout the 1990s. It began after President Samuel Doe's rise to power. Doe was a member of the Krahn, an ethnic group native to Liberia and Côte d'Ivoire, and he established a regime notorious for its corruption and

---

[1] We derive the following facts from the administrative record, which includes Paye's immigration-court testimony (which the IJ found credible), the record before the BIA and IJ, and their decisions. See Espinoza-Ochoa v. Garland, 89 F.4th 222, 227 n.1 (1st Cir. 2023).

brutality. Krahns unaffiliated with Doe were perceived as his supporters and accused of being culpable for his atrocities in Liberia, including targeting "rival" ethnicities for arrest, torture, and execution. Doe's brutality sparked rebellion, and Charles Taylor formed a band of rebels -- the National Patriotic Front of Liberia ("NPFL") -- to oppose Doe.

But the NPFL did not limit itself to combatting Doe. Instead, it targeted innocent Krahns at Taylor's behest. Indeed, one of Taylor's top lieutenants purportedly used the catchphrase, "The only good Krahn man is a dead Krahn man." Taylor and the NPFL thus caused the mass exodus of Liberians, mostly Krahns, in the wake of widespread killing and torture. And during that period, NPFL commander Prince Johnson broke off and formed the Independent National Patriotic Front of Liberia ("INPFL"), another rebel group, which committed human-rights abuses alongside the NPFL. By October of 1990, roughly two-thirds of Liberia's 125,000 native Krahns had fled the country to escape the NPFL and INPFL.

The INPFL captured and executed Doe on September 9, 1990. And so, the war and systematic extermination of Krahns continued. Soldiers affiliated with Doe fled to neighboring Sierra Leone, and, after reorganizing with Sierra Leone's backing, clashed with NPFL invaders in March 1991. NPFL forces continued their atrocities on the border, including executing Krahn civilians.

Taylor became president of Liberia in 1997, while human-rights groups noted that ethnic cleansing and genocide for Krahns continued in the years leading up to the end of the civil war in 2003. By that time, Taylor faced resistance from various groups in Liberia, including those backed by the Guinean government. In 2003, he abdicated his role as president in exchange for immunity and fled to Nigeria.

Paye, who is Krahn, was born in Monrovia, Liberia in 1990. When he turned two years old, he fled Liberia with his mother to Sierra Leone to escape the ethnic cleansing and genocide of the Krahn people. He, along with his uncle and mother, resided in refugee camps in Sierra Leone until 1996 or 1997. With his uncle and mother, Paye attempted to flee Sierra Leone to Guinea because NPFL forces began hunting Krahns residing in Sierra Leone.

But, at the Guinean border, Paye and his family were detained by armed men in military fatigues. The men questioned Paye and his family, and one of the men struck Paye repeatedly with a rifle butt in the back of his head -- opening a hole in the back of his ear and damaging his hearing. This, the man said, "marked" Paye. Because the men spoke "Liberian English" with a distinctive accent, Paye believed that they were from Liberia.

Paye stayed in refugee camps until he entered the United States in 2005 as a refugee. His mother died in a refugee camp in Guinea due to illness, while his uncle died in 2010 in the United

States. Paye's status was adjusted to that of a lawful permanent resident on May 20, 2010, retroactive to his entry in 2005, pursuant to 8 U.S.C. § 1159.

## B. Removal Proceedings

Paye was convicted in the U.S. District Court for the District of Rhode Island and sentenced to three years of probation on February 3, 2020, after he pled guilty on a three-count indictment to various firearms-related offenses. Nine months later, the United States Immigration and Customs Enforcement detained Paye for removal proceedings because he was convicted of an aggravated felony and firearm offense, pursuant to the Immigration and Naturalization Act ("INA"), 8 U.S.C. §§ 1227(a)(2)(A)(iii), (a)(2)(C). In turn, Paye sought asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"). In his brief to the IJ, he argued, among other things, that his forced flight from Liberia due to the NPFL and INPFL's ethnic cleansing and genocide against Krahns was past persecution.

Before the IJ on December 22, 2020, Paye testified about his escape from ethnic cleansing and genocide in Liberia, his encounter at the Guinean border, and the moments leading up to his arrest and conviction. The IJ considered Paye's testimony credible but denied his petition on all grounds.

First, the IJ determined that Paye's firearms convictions qualified as "particularly serious crimes," making him ineligible for withholding of removal. Second, the IJ denied Paye's withholding-of-removal and CAT claims on the merits. The IJ acknowledged the violence in Liberia from the civil war and how this meant that Krahns were systematically targeted. And the IJ recognized that the evidence in the record (namely, a report on the current country conditions in Liberia) "note[d] that impunity for individuals who committed human[-]rights abuses, including atrocities during the Liberian civil war . . . , remained a serious problem." Nevertheless, the IJ referenced signs that Liberia is more stable than it was when Paye left, stating, as an example, the current president's endorsement of a "war court" to try those who committed war crimes during the civil war. In dismissing Paye's concerns, the IJ stated that Paye had not shown that it was "more likely than not he would be harmed on account of his membership in a particular social group, his Krahn ethnicity." The IJ determined that Paye's "claim for fear of return to Liberia is basically focused and rests on [the] Liberian civil war," which ended in 2003.

The IJ then shifted to Paye's claim for past persecution. He stated that "it does not appear [Paye] suffered past persecution, notwithstanding what happened to him on the border between Sierra Leone and Guinea, because the [c]ourt cannot find

that what happened to [Paye] was at the hands of government officials from Liberia." To the IJ, it was not enough that Paye explained that his assailant "spoke Liberian English . . . to conclude" that this "individual was acting on behalf of the government of Liberia," especially where the attack "took place in Sierra Leone on the border with Guinea."

Paye appealed, arguing, among other things, that having to flee Liberia because of ethnic cleansing and genocide against Krahns qualified as past persecution, thereby entitling him to a presumption that he would face future persecution in Liberia. See 8 C.F.R. § 1208.13(b)(1). The BIA affirmed. The BIA held that Paye's underlying convictions were particularly serious crimes, dismissing his appeal on that basis alone. Paye appealed to us, seeking a stay of removal and vacatur. We granted the stay, and, before we could review his petition, granted the government's motion to voluntarily remand the case to the BIA so that it could revisit his petition in light of Matter of B-Z-R, 28 I. & N. Dec. 563, 565-67 (A.G. 2022), which provided new guidance on how to determine whether crimes under the relevant INA provisions are "particularly serious."

On remand, Paye argued to the BIA, among other things, that his forced escape from ethnic cleansing and genocide qualified as past persecution and entitled him to the future-persecution presumption. In dismissing Paye's appeal this time, the BIA

- 8 -

limited its analysis to whether Paye met the standards for withholding of removal and CAT protection. It agreed with the IJ that Paye did not show past persecution because he was assaulted "when he was between the border of Sierra Leone and Guinea[.] [The BIA, like the IJ,] could not conclude that the Liberian government was responsible simply because the perpetrator spoke Liberian English."

Paye filed the present petition on May 10, 2023. We sort his grounds for relief into three categories: (1) his forced flight from ethnic cleansing and genocide, (2) his assault at the border, and (3) whether the BIA erred in analyzing his ethnicity-based future-persecution claim.

## II. DISCUSSION

### A. Legal Standards

We first set out the legal standards applicable to Paye's petition. "When 'the BIA adopts and affirms the IJ's ruling but also examines some of the IJ's conclusions, this [c]ourt reviews both the BIA's and IJ's opinions'" to the extent the BIA adopts the IJ's opinion. H.H. v. Garland, 52 F.4th 8, 16 (1st Cir. 2022) (alteration in original) (quoting Sanabria Morales v. Barr, 967 F.3d 15, 19 (1st Cir. 2020)). "In conducting our review, we defer to the agency's factual determinations 'as long as those determinations are supported by substantial evidence,' but we review questions of law de novo." Pineda-Maldonado v. Garland, 91

- 9 -

F.4th 76, 80 (1st Cir. 2024) (quoting Ahmed v. Holder, 611 F.3d 90, 94 (1st Cir. 2010)).

Applicants prove their eligibility for withholding of removal when they demonstrate "a clear probability that, if returned to [their] homeland, [they] will be persecuted on account of a statutorily protected ground." Espinoza-Ochoa v. Garland, 89 F.4th 222, 230 (1st Cir. 2023) (quoting Sanchez-Vasquez v. Garland, 994 F.3d 40, 46 (1st Cir. 2021)). "Establishing [eligibility] requires proof of three discrete elements: a threshold level of past or anticipated serious harm, a nexus between that harm and government action or inaction, and a causal connection to one of the five statutorily protected grounds."[2] Sanchez-Vasquez, 994 F.3d at 46 (citing Carvalho-Frois v. Holder, 667 F.3d 69, 72 (1st Cir. 2012)).

Two requirements deserve further explanation, including the "past or anticipated serious" harm prong. Id. "'Persecution' is not defined by statute, and 'what constitutes persecution is resolved on a case-by-case basis.'" Yong Gao v. Barr, 950 F.3d 147, 152 (1st Cir. 2020) (quoting Panoto v. Holder, 770 F.3d 43,

_____

[2] Because the standard for a withholding-of-removal claim is higher than an asylum claim -- requiring "a clear probability of persecution" rather than a mere "well-founded fear of persecution" -- "'asylum precedents may be helpful in analyzing withholding-of-removal cases,' and vice versa." Barnica-Lopez v. Garland, 59 F.4th 520, 528 (1st Cir. 2023) (quoting Sanchez-Vasquez, 994 F.3d at 46).

46 (1st Cir. 2014)).  We consider "[t]he severity, duration, and frequency" of abuse and ask "whether harm is systematic rather than reflective of a series of isolated incidents." Id. (quoting Thapaliya v. Holder, 750 F.3d 56, 59 (1st Cir. 2014)).  "The abuse must also 'have reached a fairly high threshold of seriousness, as well as some regularity and frequency.'" Ordonez-Quino v. Holder, 760 F.3d 80, 91 (1st Cir. 2014) (quoting Ivanov v. Holder, 736 F.3d 5, 11 (1st Cir. 2013)).  But petitioners need not suffer physical harm for their abuse to qualify as past persecution.  See Chen Qin v. Lynch, 833 F.3d 40, 44 (1st Cir. 2016) ("[W]e view persecution as encompassing not only death and imprisonment, but [also] the well-founded fear of non-life[-]threatening violence and physical abuse." (second alteration in original) (internal quotation marks omitted) (quoting Marquez v. INS, 105 F.3d 374, 379 (7th Cir. 1997))).  For example, "[w]e have long held that credible, specific threats can amount to persecution if they are severe enough -- particularly if they are death threats." Aguilar-Escoto v. Garland, 59 F.4th 510, 516 (1st Cir. 2023) (internal quotation marks omitted) (quoting Javed v. Holder, 715 F.3d 391, 395-96 (1st Cir. 2009)) (collecting cases); see also Aguilar-Solis v. INS, 168 F.3d 565, 570 (1st Cir. 1999) ("[P]ersecution encompasses more than threats to life or freedom, but less than mere harassment or annoyance." (citations omitted)).

Also relevant here is the third requirement: "petitioners must show that the underlying past mistreatment that they allege occurred is the direct result of government action, government-supported action, or government's unwillingness or inability to control private conduct." Vila-Castro v. Garland, 77 F.4th 10, 13 (1st Cir. 2023) (cleaned up) (quoting Orelien v. Gonzales, 467 F.3d 67, 72 (1st Cir. 2006)); see also Orelien, 467 F.3d at 72 ("[A]ction by non-governmental actors can undergird a claim of persecution only if there is some showing that the alleged persecutors are in league with the government or are not controllable by the government." (alteration in original) (quoting Da Silva v. Ashcroft, 394 F.3d 1, 7 (1st Cir. 2005))). "'[U]nwillingness and inability are distinct issues' and the 'inquiry into whether there is a government nexus must include separate consideration of the evidence of unwillingness and the evidence of inability.'" Singh v. Garland, 87 F.4th 52, 59-60 (1st Cir. 2023) (quoting Rosales Justo v. Sessions, 895 F.3d 154, 163, 164 n.8 (1st Cir. 2018)).

## B. Jurisdiction

We pause briefly to consider our jurisdiction. The government beckons us to dismiss this appeal for lacking statutory jurisdiction, contending that Paye's withholding-of-removal claim is not a colorable legal or constitutional claim. The government directs our attention to 8 U.S.C. § 1252(a)(2)(C), which provides

that "no court shall have jurisdiction to review any final order of removal against [a noncitizen] who is removable by reason of having committed [certain] criminal offense[s]." Because Paye was convicted of offenses that fall within this statutory purview, the government argues that we cannot review his petition for removal. And, although the government recognizes our ability to consider questions of law and colorable constitutional claims under § 1252(a)(2)(D), it characterizes Paye's arguments as falling outside this exception.

It is true that although the INA limits our statutory jurisdiction "to review any final order of removal against [a non-citizen] who is removable by reason of having committed a [covered] criminal offense," id. § 1252(a)(2)(C), we maintain jurisdiction in this realm to review "constitutional claims or questions of law," id. § 1252(a)(2)(D). And it is also true that, although "an agency need not spell out every last detail of its reasoning where the logical underpinnings are clear from the record," "the agency is obligated to offer more explanation when the record suggests strong arguments for the petitioner that the agency has not considered." Aguilar-Escoto, 59 F.4th at 517 (cleaned up). Thus, we possess jurisdiction under § 1252(a)(2)(D) where "[the agency] failed to meet this standard given its total lack of analysis -- or, indeed, mention -- of critical evidence." Id.; see Rodríguez-Villar v. Barr, 930 F.3d 24, 29 (1st Cir. 2019)

(characterizing the agency's failure to consider "critical evidence supporting the petitioner's claim for withholding of removal and in using such evidence as part of its rationale for denying that claim" as a legal error). And here, we review whether the agency failed to address Paye's escape from ethnic cleansing and genocide in Liberia, which is a question of law. See Aguilar-Escoto, 59 F.4th at 517. Under this approach, we do not profess to reweigh the facts, so we have jurisdiction to proceed.

Moreover, to the extent Paye's arguments concerning the border attack raise novel issues of statutory jurisdiction, we often "bypass[] enigmatic jurisdictional questions in circumstances in which precedent clearly adumbrates the result on the merits." Royal Siam Corp. v. Chertoff, 484 F.3d 139, 144 (1st Cir. 2007); see also Seale v. INS, 323 F.3d 150, 157 (1st Cir. 2003) (applying hypothetical jurisdiction in an immigration appeal where the "petitioner clearly loses on the merits of his claims"). As we explain, our resolution on why Paye's arguments concerning whether the agency erred in analyzing his argument that the border attack constituted past persecution fail is straightforward. Thus, we shall assume hypothetical jurisdiction to resolve them.[3]

---

[3] At our request, the parties briefed the impact of Wilkinson v. Garland, 601 U.S. 209, 217 (2024), in which the Supreme Court held that the federal courts of appeal possess jurisdiction under 8 U.S.C. § 1252(a)(2)(D) to review "the application of the exceptional and extremely unusual hardship standard to a given set of facts." We, however, premise our jurisdiction on our ability

- 14 -

**C. Escape from Ethnic Cleansing and Genocide as Past Persecution**

We return to the principles elucidated above to review whether the agency adequately addressed if Paye's childhood escape from ethnic cleansing and genocide in Liberia constituted past persecution. Our cases require the agency "'to articulate [its] reasoning on [an] issue with sufficient particularity and clarity' to permit us to 'infer the factual or legal basis for [that] determination.'" Pineda-Maldonado, 91 F.4th at 81 (third alteration in original) (quoting H.H., 52 F.4th at 23); see also Panoto, 770 F.3d at 46; Sok v. Mukasey, 526 F.3d 48, 53 (1st Cir. 2008); Hernandez-Barrera v. Ashcroft, 373 F.3d 9, 25 (1st Cir. 2004). "[It] must, at a minimum, 'fairly appraise the record'" and cannot ignore "salient facts." Rodríguez-Villar, 930 F.3d at 28 (quoting Sihotang v. Sessions, 900 F.3d 46, 51 (1st Cir. 2018)).

The record reveals that Paye argued at every level of review that his forced flight due to the Liberian rebel forces' ethnic cleansing and genocidal killing of Krahn people was past persecution. Yet the agency appears to have "completely overlooked [this] critical evidence." Sihotang, 900 F.3d at 51. The IJ

---

to review the agency's total lack of analysis of Paye's escape from ethnic cleansing and genocide in Liberia, which is a question of law under § 1252(a)(2)(D). See Aguilar-Escoto, 59 F.4th at 517. And we assume hypothetical jurisdiction to reject Paye's arguments concerning the border attack, as is our usual practice. See Seale, 323 F.3d at 157. Therefore, we need not consider Wilkinson.

mentioned such evidence only when reciting the facts underlying Paye's claims, and the BIA did not address it. Under our precedent, the agency was required to address this potential evidence of past persecution. See Aguilar-Escoto, 59 F.4th at 517.

In recognizing this, we reject the government's argument that the IJ's acknowledgment that Paye fled Liberia as a child shows that the agency rejected his past-persecution argument. Although the agency's findings "on all grounds that are necessary" to support its decision may be "either explicit or implicit," Rotinsulu v. Mukasey, 515 F.3d 68, 73 (1st Cir. 2008) (citing Un v. Gonzales, 415 F.3d 205, 209 (1st Cir. 2005)), we cannot infer that the agency here implicitly held that Paye's forced flight due to the genocidal killing and ethnic cleansing of Krahn people did not constitute past persecution. See Pineda-Maldonado, 91 F.4th at 81. While it appears that the IJ found that the conditions in Liberia have improved since the civil war ended in 2003, it is unclear how this is relevant to Paye's escape from Liberia during the height of the civil war. Cf. Hernandez-Barrera, 373 F.3d at 22-23. And, given Paye's credible testimony and evidence of his forced flight from Liberia due to the ethnic cleansing and genocide against the Krahns during the civil war, "[w]e cannot say the evidence compels a conclusion either way," so we "must remand to the agency to make a well-reasoned and well-explained

- 16 -

determination of [Paye's] eligibility."  Sok, 526 F.3d at 58 (quoting El Moraghy v. Ashcroft, 331 F.3d 195, 205 (1st Cir. 2003)).

The government claims that just because "Paye and his mother fled Liberia does not automatically entitle him to a finding of past persecution," but this generalization misses the mark. True, a "fear of harm from general conditions of violence and civil unrest does not even establish a 'well-founded fear of persecution,' the asylum standard, much less a clear probability of persecution, the withholding of removal standard." Tay-Chan v. Holder, 699 F.3d 107, 112-13 (1st Cir. 2012) (discussing this standard only as to whether the petitioner established a cognizable social group).  But the agency did not weigh the evidence of Paye's flight from Liberia -- due to the targeted ethnic cleansing and genocide of Krahns, not general unrest -- in its past-persecution calculus.  This argument thus leads us back to the start: we must vacate the agency's ruling because it did not address Paye's forced flight from ethnic cleansing and genocide in Liberia.  See Aguilar-Escoto, 59 F.4th at 517.

The government's final riposte highlights what it believes to be a paucity of evidence connecting the harm Paye suffered with the Liberian government.  It defends the agency by declaring that the agency was "not required to write an exegesis on every contention," Peulic v. Garland, 22 F.4th 340, 352 n.8

(1st Cir. 2022) (citation omitted), and characterizes the agency's conclusion that the Liberian government was not responsible for the border incident as an implicit rejection that the Liberian government had any responsibility for the genocide and ethnic cleansing of the Krahn whatsoever. However, we glean no basis to support the government's reading. The IJ stated only that he could not find that "what happened to [Paye] on the border . . . was at the hands of government officials from Liberia," and the BIA agreed. As for the question of whether Paye's flight was past persecution, it does not appear that the agency engaged with Liberia's potential unwillingness or inability to restrain his potential persecutors outside of the border attack, warranting remand.[4] See Aguilar-Escoto, 59 F.4th at 518 (vacating and remanding where "the IJ never addressed whether [the petitioner] had shown that the Honduran government was unwilling or unable to protect her from the past harm perpetrated by" her purported persecutor because the IJ simply concluded that the petitioner did not suffer past persecution).

_____

[4] The government's argument that we should affirm the agency because the BIA cited our cases correctly setting forth the "government action" prong -- including a government's inability or unwillingness to restrain private actors -- is unavailing. Although the BIA cited the proper standard setting forth this prong, that does not salvage its decision because, as we have explained, it failed to consider why Paye's forced flight due to the Liberian rebel forces' ethnic cleansing and genocidal killing of Krahn people was not past persecution. See Aguilar-Escoto, 59 F.4th at 517.

- 18 -

We provide further guidance to the agency on remand. If Paye suffered past persecution, either due to the Liberian government's action or unwillingness or inability to restrain private actors, he is entitled to a presumption of future persecution. See 8 C.F.R. § 1208.13(b)(1); Aguilar-Escoto, 59 F.4th at 518-19. "[T]he absence of reasoned discussion of past persecution undercuts any meaningful review of the [agency's] fear of future persecution finding, because we do not know whether [Paye] should have had the benefit of the regulatory presumption of fear of persecution based on prior events." Pineda-Maldonado, 91 F.4th at 84 (first and second alterations in original) (quoting Hernandez-Barrera, 373 F.3d at 22). We emphasize this presumption because the IJ acknowledged ongoing human-rights violations in Liberia and impunity of those who are responsible for atrocities during the civil war. Cf. Ordonez-Quino, 760 F.3d at 93 (recognizing that the agency could not deny withholding of removal solely because militants after the Guatemalan civil war integrated with the government where the agency did not meaningfully engage with current-country-conditions evidence pointing to Guatemala's continuing discrimination against indigenous Mayan Quiché or how that evidence affected the petitioner). And because the IJ concluded only that Paye had not met his burden on this point, we cannot discern whether the presumption could have had a meaningful impact on Paye's chances of success.

To be clear, we express no opinion on whether Paye's past-persecution argument based on his forced flight from Liberia due to ethnic cleansing and genocidal killing of the Krahn people has merit. But we must remand here so that the agency may articulate its reasoning on this point with enough clarity for us to review.

### D. Border Attack

We turn next to Paye's arguments concerning withholding of removal based on his attack at the Sierra Leone-Guinea border. As he argued before the BIA, he now argues that the agency erred because it did not consider that "persecution can be at the hands of non-state actors" and emphasizes that the IJ contended that the Liberian government was not responsible for the border attack. He further contends that the agency did not meaningfully engage with his claim that the Liberian government could be responsible for this act of persecution that it was unwilling or unable to address.

We do not find error in the agency's analysis of the border attack. Rather, despite Paye's contrary construction of the agency's decisions, the agency did conclude that Paye did not meet his burden to show that the Liberian government was responsible -- by action or acquiescence -- for the border attack. We thus affirm this ruling.

The IJ concluded that there was an insufficient connection between the attack and the Liberian government because

the attack took place at the border of two countries other than Liberia and Paye's proffered support -- that his assailants spoke Liberian English and could have been Taylor's forces who pursued him into Sierra Leone -- did not satisfy his evidentiary burden. The BIA agreed with the IJ's determination that the Liberian government could not be "responsible" for an incident at the border of two different nations "simply because the perpetrator spoke Liberian English," and it quoted thereafter to our decision in Panoto v. Holder, 770 F.3d 43, 46 (1st Cir. 2014), for the proposition that an asylum applicant must prove "that government action or acquiescence caused or resulted in the mistreatment giving rise to [his] claim" (emphasis added). Thus, contrary to Paye's argument on appeal, that the agency referenced whether "the Liberian government was responsible" did not signal that it believed that only the government could persecute him. Rather, with the BIA's citation to Panoto and reference to the Liberian government being "responsible," the BIA implicitly recognized that the Liberian government could be responsible for persecution if it acquiesced to its occurrence and determined that Paye failed to carry his burden on this point. See Hanan v. Mukasey, 519 F.3d 760, 764 (8th Cir. 2008) (finding that the record did not support the claim that the agency failed to consider persecution under a government-acquiescence theory where the agency, in part, cited to the correct legal standard).

Accordingly, the agency recognized that non-state actors can be persecutors and simply rejected that the Liberian government acquiesced to such persecution. We therefore find no error in the agency's analysis of the border attack.

### E. Future-Persecution Arguments

Paye raises two arguments concerning the agency's conclusion that he failed to establish his Krahn-ethnicity-based future-persecution claim for withholding of removal: (1) the BIA applied an incorrect statutory standard, and (2) the BIA did not review the IJ's nexus determination de novo.[5] However, Paye informs us that if we were to rule in his favor and vacate the agency's conclusion that he was not entitled to withholding of removal based on past persecution, then this "is sufficient to vacate [the agency's] withholding analysis in its entirety." He notes that the agency's analysis, including on his future-persecution claim, is flawed because its failure to conclude whether he suffered past persecution for escaping ethnic cleansing and genocide potentially deprived him of the presumption of future persecution. Thus, he contends that if we "agree[] with [him] that the BIA committed reversible errors in the past

---

[5] Were we to resolve these claims, they would be within our statutory jurisdiction because they are "questions of law" under § 1252(a)(2)(D). See Adeyanju v. Garland, 27 F.4th 25, 37 (1st Cir. 2022); Peulic, 22 F.4th at 346 (noting that whether the agency applied the "wrong legal standard" is a question of law).

persecution analysis, then [we] do[] not need to reach his future persecution claim."

We agree. As we noted above, the agency's failure to analyze Paye's ethnic-cleansing-and-genocide-based past-persecution claim meant that it analyzed his future-persecution claim without the presumption. Indeed, the IJ and BIA premised their rejection of Paye's claim on his failure to meet his burden. We are left guessing whether things would have turned out differently if Paye received the presumption because the agency denied his future-persecution claim based only on his purported failure to meet his burden.

True, we have excused the agency's failure to afford this presumption when "the record makes it abundantly clear that the petitioner will not likely suffer future persecution if sent back to her home country." Sok, 526 F.3d at 56. But this case is not so "clear-cut that the allocation" of the burden "does not matter." Id. at 57 (quoting Palma-Mazariegos v. Gonzáles, 428 F.3d 30, 35 (1st Cir. 2005)). As the IJ recognized, the evidence in the record regarding Liberia's stability cut both ways -- some indicating "impunity" for those who committed war crimes, some suggesting that stability is now the norm. We cannot say that a regulatory burden would make no difference.

Thus, the proper course here is to vacate the agency's withholding-of-removal analysis in its entirety and remand for

further consideration.  See Pineda-Maldonado, 91 F.4th at 84, 91; Hernandez-Barrera, 373 F.3d at 23-26; see also, e.g., Singh v. Garland, 57 F.4th 643, 657-58 (9th Cir. 2023).  Because this means that we need not address Paye's future-persecution arguments (as he suggests), then we shall not do so.

### III. CONCLUSION

For the reasons we have detailed above, the agency should have addressed Paye's claim that his flight from Liberia to escape ethnic cleansing and genocide was evidence of past persecution. And it should have done so with enough particularity and clarity to facilitate appellate review.  Although we reject Paye's argument that the agency erred in analyzing the border attack, we agree that the agency's failure to analyze his argument that his forced flight from Liberia was past persecution counsels us to vacate its decision.  We therefore (1) **grant in part** the petition for review, (2) **vacate** the BIA's decision, and (3) **remand** for proceedings consistent with this opinion.