# United States Court of Appeals
## For the First Circuit

No. 24-1913

FRANTZER FLEURIMOND,

Petitioner,

v.

PAMELA J. BONDI, Attorney General,[*]

Respondent.

PETITION FOR REVIEW OF AN ORDER OF
THE BOARD OF IMMIGRATION APPEALS

Before

Barron, Chief Judge,
Howard and Montecalvo, Circuit Judges.

SangYeob Kim, with whom Gilles Bissonnette, Chelsea Eddy, and the American Civil Liberties Union of New Hampshire were on brief, for petitioner.

Robert Dale Tennyson, Jr., Senior Litigation Counsel, Civil Division, with whom Drew Ensign, Deputy Assistant Attorney General, Civil Division, Carl H. McIntyre, Jr., Assistant Director, Office of Immigration Litigation, and Paul Fiorino, Senior Litigation Counsel, Office of Immigration Litigation, Civil Division, were on brief, for respondent.

---

[*] Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Attorney General Pamela J. Bondi is automatically substituted for former Attorney General Merrick B. Garland as respondent.

September 18, 2025

**BARRON**, **Chief Judge**.  Frantzer Fleurimond, a native and citizen of Haiti, petitions for review of a decision by the Board of Immigration Appeals (BIA) that affirmed the denial of his claim for deferral of removal under the U.S. regulations implementing the Convention Against Torture (CAT).  We grant the petition with respect to Fleurimond's contention that the BIA failed to address his CAT claim insofar as he bases the claim on the risk that lower-level government officials in Haiti would torture him while he is held in a detention facility or prison in that country.  We remand the petition to the BIA on this ground.  The petition is otherwise denied.

## I.

Fleurimond is a 37-year-old native and citizen of Haiti. He was admitted to the United States as a lawful permanent resident on or about May 17, 2001, when he was 13 years old.

In June 2023, the U.S. Department of Homeland Security (DHS) initiated proceedings to remove Fleurimond from the United States by serving him with a Notice to Appear.  The Immigration and Nationality Act (INA) provides that "[a]ny alien who is convicted of an aggravated felony at any time after admission is deportable."  8 U.S.C. § 1227(a)(2)(A)(iii).  The Notice to Appear stated that Fleurimond was removable pursuant to § 1227(a)(2)(A)(iii) because he had been convicted in New Hampshire "for the offense of Sale of a Controlled Drug," and the

INA defines "aggravated felony" to include "illicit trafficking in a controlled substance . . . including a drug trafficking crime." 8 U.S.C. § 1101(a)(43)(B).

Fleurimond was detained, and removal proceedings began shortly thereafter. Following the appointment of counsel, Fleurimond challenged removability on several grounds.

On December 5, 2023, an immigration judge (IJ) issued a written order sustaining the removal charge. After the removability ruling, Fleurimond asserted various grounds for relief. They included the only basis for relief that is at issue here -- namely, that he is entitled to deferral of removal under CAT.

To be so entitled, a petitioner must show that they "would more likely than not be subject to torture if removed to [the proposed country of removal]." H.H. v. Garland, 52 F.4th 8, 16 (1st Cir. 2022). "Torture is defined as '(1) an act causing severe physical or mental pain or suffering; (2) intentionally inflicted; (3) for a proscribed purpose; (4) by or at the instigation of or with the consent or acquiescence of a public official who has custody or physical control of the victim; and (5) not arising from lawful sanctions.'" Murillo Morocho v. Garland, 80 F.4th 61, 65 (1st Cir. 2023) (quoting Elien v. Ashcroft, 364 F.3d 392, 398 (1st Cir. 2004)). "Proscribed

purposes" include obtaining information, punishment, intimidation or coercion, and discrimination.  See 8 C.F.R. § 1208.18(a)(1).

Fleurimond contended in support of his request for deferral of removal under CAT that he faced risks of torture:

> (1) by Haitian authorities as a criminal deportee immediately upon arrival in Haiti, with his severe mental illness increasing this risk of torture; (2) as a severely mentally ill criminal deportee outside of custody by Haitian authorities or its agents -- including the gangs[;] (3) in a govenrment-run [sic] Haitian mental health hospital[; and] (4) by Carl Hentz's family and those seeking to avenge Carl Hentz's murder.

Fleurimond provided evidence in support of each source of torture.  In support of his alleged risk of torture "by Carl Hentz's family," Fleurimond provided evidence that the family "blame[d] Mr. Fleurimond for" the murder of Hentz, that Hentz's father "had been previously deported to Haiti," and that Fleurimond "fear[s] that [Hentz's] family will murder him if he is sent back to Haiti."

On May 7, 2024, after conducting two hearings on the merits, the IJ assigned to consider Fleurimond's application for relief denied it in an oral decision.  Fleurimond appealed, and the BIA affirmed the IJ's ruling on October 7, 2024.  Fleurimond timely filed a petition for review.

If the BIA finds "only that the IJ's findings were not clearly erroneous . . . . we focus our review on the BIA's decision." Aguilar-Escoto v. Garland, 59 F.4th 510, 515 (1st Cir. 2023). If the BIA "adopts portions of the IJ's findings while adding its own gloss, we review both the IJ's and the BIA's decisions as a unit." Paiz-Morales v. Lynch, 795 F.3d 238, 242 (1st Cir. 2015) (quoting Renaut v. Lynch, 791 F.3d 163, 166 (1st Cir. 2015)).

We review findings of fact by the BIA and the IJ (collectively, "the agency") for substantial evidence. Lin v. Mukasey, 521 F.3d 22, 25-26 (1st Cir. 2008). Under that standard, "the agency's findings are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary of the finding." Id. "We review the agency's legal conclusions de novo." Espinoza-Ochoa v. Garland, 89 F.4th 222, 230 (1st Cir. 2023).[1]

---

[1] We note that in Espinoza-Ochoa, we went on to say that in conducting our de novo review, we do so "with 'some deference to [an agency's] interpretations of statutes and regulations related to immigration matters.'" 89 F.4th 222, 230 (1st Cir. 2023) (quoting Aldana-Ramos v. Holder, 757 F.3d 9, 14 (1st Cir. 2014)). Because no issue is raised by the parties that implicates the question of what, if any, deference would be owed to an agency's interpretation of either a statute or a regulation, we have no occasion here to address how Kisor v. Wilkie, 588 U.S. 558 (2019), or Loper Bright Enters. v. Raimondo, 603 U.S. 369 (2024), might bear on such questions.

We begin with Fleurimond's contention that the BIA failed to address his CAT claim insofar as that claim rests on the risk that low-level government officials in Haiti would torture him while he is being held in a Haitian detention facility or prison. Fleurimond relies on the portion of the BIA decision that addressed whether "he more likely than not would be 'tortured' within the meaning of [CAT] in Haitian prisons and detention centers," as he contends that is the only portion that even potentially addressed this specific alleged risk of torture.

The Attorney General does not appear to disagree that this passage is key. She nonetheless contends that we must construe the passage to have addressed the CAT claim in the relevant respect -- if not expressly then at least impliedly. That is in part, she contends, because of what the IJ had to say. We are not persuaded.

**A.**

In the portion of the BIA decision at issue, the BIA stated:

> The record supports the [IJ's] determination that corporal punishment, extrajudicial force and killings, deprivation of medication, and unsanitary conditions are significant problems in detention settings in Haiti. However, we will not disturb the [IJ's] finding that the respondent failed to show that the Haitian government maintains these conditions with the specific intent of

- 7 -

> "torturing" detainees within the meaning of 8
> C.F.R. § 1208.18(a). Moreover, the [IJ] did
> not clearly err in finding that while the
> respondent could experience prolonged
> detention if he and his family are unable to
> pay extortion to public officials to secure
> his release, his continued detention would not
> occur with the intent of "torturing" him
> through exposure to squalid prison conditions.

(Citations omitted).

Fleurimond zeroes in on the passage's statement that "the Haitian government maintains these conditions." He contends that the word "maintains," when paired with the phrases "the Haitian government" and "these conditions," cannot be read to refer to the act of directly committing torture on a person in a detention facility or prison. Instead, he contends, that word, in context, must be read to be referring to the actions of the persons who oversee those who directly commit such torture.

Fleurimond then argues that it follows that the passage fails to indicate that the BIA addressed his CAT claim insofar as it rests on his alleged risk of torture from the low-level officials working in prisons and detention facilities in Haiti. Fleurimond explains that this must be so because he alleges that those officials directly engage in the torture of prisoners and detainees.

In other words, on Fleurimond's reading of the passage, the BIA held only that the higher-level Haitian government officials -- those who oversee the operation of Haitian detention

- 8 -

facilities and prisons -- lacked the requisite intent to be deemed to have themselves engaged in torture.  As a result, on his account, the BIA gave no reason for rejecting his CAT claim insofar as that claim rests on the distinct risk of torture committed directly by low-level officials.  For, whatever the intent of the higher-level officials may have been while the torture was being committed by those low-level officials, the low-level officials themselves could have had the requisite intent in directly engaging in the torture.

Fleurimond's reasoning is persuasive.  Because the passage at issue references the "Haitian government" generally and its role in "maintain[ing] these conditions" specifically, it is best read to address the intent of the high-level officials in overseeing low-level officials in detention facilities and prisons, not the intent of the low-level officials operating in those institutions.  Cf. Yerian v. Webber (In re Yerian), 927 F.3d 1223, 1232 (11th Cir. 2019) ("To 'maintain' . . . is to 'continue' or 'keep in a certain condition.'" (first quoting Webster's New World College Dictionary 880 (5th ed. 2014); and then quoting Black's Law Dictionary 1097 (10th ed. 2014))).

Consistent with this reading, we note that the BIA stated earlier in the passage that "extrajudicial force and killings" are "significant problems in detention settings in Haiti."  Yet the decision does not appear to offer any explanation for rejecting

- 9 -

Fleurimond's CAT claim insofar as it rests on the alleged risk of torture from the low-level officials.

To be sure, the Attorney General did suggest at oral argument that prison guards might kill or beat prisoners without the requisite intent in "attempting to maintain order in a very disorderly and very resource-light environment [and] that results in someone being killed."  But there is no indication that the BIA determined that the record showed that the extrajudicial killings and beatings that it described are carried out in this manner.  Indeed, one would expect the BIA to have made clear that the record did so show if its decision depended on the record having done so.  Nor, we should add, is there anything in the record that would warrant our inferring that the BIA must have been referring only to "extrajudicial killings" and "beatings" that were not intended to rise to the level of torture when it made the statement about the "significant problems" in Haitian detention facilities and prisons.  Accordingly, we decline to attribute this hypothesized rationale to the BIA.  See Rivera-Medrano v. Garland, 47 F.4th 29, 39 (1st Cir. 2022) ("While the BIA 'need not spell out every last detail of its reasoning where the logical underpinnings are clear from the record,' it 'is obligated to offer more explanation when the record suggests strong arguments for the petitioner that the agency has not considered.'" (citation modified) (quoting Enwonwu v. Gonzales, 438 F.3d 22, 35 (1st Cir. 2006))).

**B.**

The Attorney General also attempts to support her reading of the key passage from the BIA's decision by invoking the IJ's decision. But Fleurimond contends that the agency failed to address this specific CAT claim because the BIA failed to address it. Moreover, the BIA indicated in relevant part only that it "will not disturb the [IJ]'s finding that the respondent failed to show that the Haitian government maintains these conditions with the specific intent of 'torturing' detainees." And, as we have explained, that "maintains" language is not best read to refer to the actions of low-level government officials in directly causing "extrajudicial killings" or carrying out "beatings" in Haitian detention facilities or prisons. Rather, it is best understood to refer to the actions of higher-level government officials in Haiti overseeing the facilities and prisons. As a result, we see little basis for concluding that, insofar as the BIA affirmed the relevant IJ's finding by deciding not to "disturb" it, the BIA affirmed what it understood to be the finding that the low-level officials engaged in beatings and caused extrajudicial killings without the requisite intent.

**C.**

For these reasons, the agency erred in denying Fleurimond's CAT claim insofar as that claim rests on his risk of torture from low-level Haitian officials while he is held in a

- 11 -

Haitian detention facility. See Paye v. Garland, 109 F.4th 1, 13 (1st Cir. 2024) (vacating BIA decision based on its failure to consider a ground for relief); Yamoah v. Lynch, 641 F. App'x 12, 16 (1st Cir. 2016) ("[I]f the BIA's position is unclear, we . . . remand to ensure that, as the reviewing court, we can adequately evaluate the agency's final decision."). We therefore vacate the BIA's order and remand the case to the BIA for consideration not inconsistent with this decision.[2]

We note that, on remand, the BIA must attend to the distinction between the intent and purpose requirements for torture that Fleurimond argues -- as an alternative ground for granting his petition -- the agency failed to make insofar as it addressed his CAT claim based on his alleged risk of torture from low-level officials while being held in prisons or detention facilities in Haiti. In that alternative ground, Fleurimond contends that, insofar as the agency addressed his CAT claim in this regard, the agency wrongly conflated "the intentional infliction requirement with the purpose requirements under the regulation."

---

[2] Fleurimond has moved to file a supplemental brief, in which he asks us to address in our remand order the possibility that DHS will seek to remove him to a country other than Haiti. We grant the motion but decline to address the possibility that he raises, given that we see no indication in the record that the government is seeking to remove Fleurimond to a country other than Haiti.

Of course, we cannot say that the BIA conflated things in the way that Fleurimond describes; we conclude that the BIA did not address the specific CAT claim at issue at all. Still, it does appear that the IJ made the error of conflation that Fleurimond identifies, as the IJ appears to have required Fleurimond to show that the government of Haiti was acting with the "purpose of inflicting severe pain or suffering on the respondent" -- rather than the "intention" of doing so. For, while a petitioner must satisfy distinct "purpose" and "intent" requirements to demonstrate a risk of torture under CAT, Murillo Morocho, 80 F.4th at 65, the "proscribed purpose" requirement does not demand that the act be completed for the purpose of inflicting severe pain or suffering, see id.; 8 C.F.R. § 1208.18(a)(1) (defining torture and listing proscribed purposes). Rather, a petitioner satisfies the "purpose" requirement by establishing that the motivation of the purported torturer would be one of those set out in § 1208.18(a)(1), while he meets the "intent" requirement by merely showing that the torturer desires for the immediate physical act to inflict severe pain or suffering. See Hernandez-Martinez v. Garland, 59 F.4th 33, 43 (1st Cir. 2023).

Finally, we note that Fleurimond argues one more thing in the alternative. He contends that, if we were to conclude that the BIA addressed the CAT claim to the extent that it is based on the risk of torture from the low-level officials operating in

- 13 -

prisons and detention facilities, then we must conclude that the BIA failed to conduct its review of the "IJ's specific intent and purpose analysis and conclusion under the de novo review standard."

We have no need to address this contention either, because Fleurimond is right that the BIA did not address his CAT claim insofar as it is based on the specific risk regarding the torture by low-level officials in prisons and detention facilities. That said, we do agree with Fleurimond that the de novo standard would be the applicable one for the BIA to apply to the IJ's interpretation of the elements of torture under § 1208.18(a)(1). See 8 C.F.R. § 1003.1(d)(3)(ii); Leao v. Bondi, 144 F.4th 43, 47 (1st Cir. 2025) ("The BIA . . . reviews de novo the IJ's conclusions of law . . . ." (citation modified)).

**IV.**

Fleurimond's petition for review also contends that the agency erred in its handling of his CAT claim insofar as the claim rests on his alleged risk of torture from gangs, mobs, or Hentz's family. With respect to these other variants of his CAT claim, he contends, in part, that the agency "committed legal errors in failing to analyze the acquiescence issue under this Court's precedents." He then also argues that the record compels a finding of CAT eligibility based on acquiescence. We are not convinced.

Fleurimond first contends that the agency failed to analyze the acquiescence requirement properly because it "failed

to determine the effectiveness of all levels of officials' efforts to prevent torture," even though he contends such analysis "is required under H.H.[ v. Garland, 52 F.4th 8 (1st Cir. 2022)], Murillo Morocho[ v. Garland, 80 F.4th 61 (1st Cir. 2023)], and Khalil[ v. Garland, 97 F.4th 54 (1st Cir. 2024)]." Fleurimond also contends that the agency failed to analyze the acquiescence requirement properly because it "misapplied the concept of willful blindness" in that it "required that anything less than an official's willful blindness to torture did not constitute a breach of legal duty."

Neither contention persuades. The record shows that the agency did assess whether Fleurimond put forth sufficient evidence to show acquiescence and held that it did not. There is nothing in H.H., Murillo Morocho, or Khalil that suggests it was error for the BIA to so conclude. Nor do we understand the agency in rejecting his attempt to show acquiescence to have required him to show willful blindness.

Fleurimond does separately argue that the evidence that he put forth compels a finding -- contrary to the agency's -- that the Haitian government would likely acquiesce to torture from gangs, mobs, or the Hentz family. As support for this last contention, he emphasizes the fact that the IJ found that: "mobs of individuals have taken to apprehending and executing suspected gang members"; "[i]n some instances, police officers have been

- 15 -

observed being permissive of . . . mob justice"; and "[t]he gangs have taken over by force certain governmental institutions, toppled certain prisons, and have taken neighborhoods and regions under their control by force." He also notes that the IJ "credit[ed] even the evidence that police officers have colluded and cross-pollinated with gangs in Haiti."

Fleurimond does not provide any reason that would compel us to discount, however, the IJ's separate finding that "[e]ven if such scenarios [demonstrating government acquiescence] are possible, have taken place in Haiti, and are documented, the respondent has not demonstrated that there is a high likelihood that this would in fact happen to him specifically." (Emphasis added.) And that failure matters because, even though the BIA affirmed that IJ finding, Fleurimond does not sufficiently explain how the evidence on which he relies compels a contrary one. See Rivas-Durán v. Barr, 927 F.3d 26, 30 (1st Cir. 2019) ("[W]e will not disturb [factual] findings if they are supported by reasonable, substantial, and probative evidence on the record considered as a whole." (citation modified)). Nor does Fleurimond sufficiently explain why the record mandates the conclusion that the IJ was unequivocally wrong in finding that "[such] scenario[s] would [not] necessarily be carried out with the acquiescence of the Haitian government, government actors, or under . . . a scenario

- 16 -

in which the Haitian government or certain actors are willfully blind to the gangs or private actors."

## V.

We come, then, to Fleurimond's challenge to the agency's determination that his proposed expert witness -- Michelle Karshan -- is not qualified as "an expert on the social or political culture of Haiti as it relates to criminal deportees from the United States." Fleurimond argues that the agency "committed a legal error" because it "determin[ed] that Ms. [Karshan] must have had academic or formal training to be qualified as an expert witness," as he contends that basis "is an impermissible [one] for disqualifying [her] as an expert witness."

The IJ "f[ound] that Ms. Karshan has relevant knowledge to offer and relevant information from personal exposure to the individuals of Haiti being deported there." The IJ went on to rely on portions of Karshan's testimony and to "credit[] . . . Karshan's[] testimony[] that she is personally aware of the deplorable and inhumane conditions in the prisons and detention centers." The IJ did so notwithstanding its determination that Karshan did not qualify as "an expert on the social or political culture of Haiti as it relates to criminal deportees from the United States."

Because the IJ appears to have accepted parts of the proposed expert's testimony, while excluding other parts, the

- 17 -

relevant questions for us are (1) whether the testimony that the IJ excluded would have had any bearing on the issues that remain to be considered on remand -- that is, the risk of torture by low-level government officials in Haitian prisons and detention facilities -- and (2) whether the exclusion of that testimony might have prejudiced Fleurimond's claim below insofar as it rests on other sources of torture than the source that grounds the CAT claim to be considered on remand.

As to the first question, the parties agree that the IJ admitted and considered Karshan's testimony that concerned the treatment of individuals who are removed from the U.S. and are detained in Haiti. We thus need not revisit the evidentiary ruling as to the remanded aspect of the CAT claim.

As to the second question, Fleurimond develops no argument that the exclusion of the testimony affected the outcome of his CAT claim insofar as it is based on risks of torture other than the risk that grounds the claim to be considered on remand. For example, he does not point to excluded testimony that could have changed the outcome of the agency's assessment of his other sources of torture. Nor, given that the IJ evidently relied on the unexcluded portions of Karshan's testimony in significant part, do we see any clear basis in the record for finding prejudice from the disqualification of Karshan as an expert. See Boadi v. Holder, 706 F.3d 854, 859 (7th Cir. 2013) ("[T]o succeed on appeal,

[the petitioner] must point to [an] alleged weakness and explain how it affected his case." (emphasis added)).

## VI.

There remains to address Fleurimond's contention that, under "the aggregate standard," the record compels the determination that he has met his burden to show that he more likely than not will be tortured if removed to Haiti. But, even assuming that the agency was required to assess the risk of torture in aggregate, see Escobar v. Garland, 122 F.4th 465, 482 (1st Cir. 2024) ("[W]e have not decided whether a claim for CAT protection must adhere to the aggregate standard."), a proper analysis of the "aggregate" risk of torture necessarily requires that each individual risk to be aggregated has been assessed with regard to how substantial it is, see Rodriguez-Arias v. Whitaker, 915 F.3d 968, 972-74 (4th Cir. 2019). Yet, as we have explained, the agency has not yet made adequate findings as to Fleurimond's claim that low-level Haitian prison guards are likely to torture him in a detention facility. Thus, it would be premature to decide here whether the agency erred in conducting that assessment under the "aggregate standard." See Rivera-Medrano, 47 F.4th at 40 ("Where a question is best resolved by the agency in the first instance, or is left primarily in the agency's hands by statute, and the agency has failed to address that question, we generally must remand." (quoting Guta-Tolossa v. Holder, 674 F.3d 57, 61 (1st

- 19 -

Cir. 2012))).  In addition, we cannot say that, setting aside the remanded portion of the CAT claim, the record compels the conclusion, based solely on the other alleged risks of torture on which the CAT claim rests, that the required level of risk of torture has been shown in the aggregate.

## VII.

For the foregoing reasons, we **grant** Fleurimond's petition for judicial review in part and **remand** the matter for further proceedings consistent with this opinion as it relates to Fleurimond's claim for deferral of removal under CAT.  The petition is otherwise **denied**.